339 F.2d 371
 Al GURTON et al., Plaintiffs-Appellants,
v.
Max L. ARONS and Al Manuti, Defendants-Appellees.
Rudolph GUARNACCIA et al., Plaintiffs-Appellants,
v.
Herman D. KENIN, as President, or Stanley Ballard, as Secretary, or George V. Clancy, as Treasurer of American Federation of Musicians, Defendant-Appellee.
 No. 226.
 Docket 29232.
 United States Court of Appeals Second Circuit.
 Argued October 30, 1964.
 Decided December 24, 1964.
 
 Burton H. Hall, New York City, for appellants.
 David I. Ashe, Ashe & Rifkin, New York City, for appellees Arons and Manuti.
 Emanuel Dannett, New York City (McGoldrick, Dannett, Horowitz & Golub, Melvin H. Osterman, Jr., New York City, of counsel), for appellees Kenin and others.
 Before LUMBARD, Chief Judge, and HAYS and MARSHALL, Circuit Judges.
 HAYS, Circuit Judge:
 
 
 1
 These two cases were consolidated in the district court where a single opinion was written covering both cases. The plaintiffs-appellants are members of Local No. 802, American Federation of Musicians. The defendants-appellees in the Gurton case are Secretary and President of Local 802. The defendants-appellees in the Guarnaccia case are President, Secretary and Treasurer of the American Federation of Musicians.
 
 
 2
 In the district court the plaintiffs sought a temporary injunction preventing the defendants "from effectuating or attempting to effectuate" a certain ruling of the International Executive Board of the Federation. The district court denied the applications for a temporary injunction and dismissed the complaints in both actions. We affirm.
 
 
 3
 There is little or no dispute about the operative facts which led up to the present controversy. In February 1964 Local 802 took a mail vote on the question of whether in the future the election of the officers of the local should be by secret ballot mail vote conducted by the Honest Ballot Association. Local 802 has 28,000 members. The vote on the proposal was 12,654 for and 2,206 against. Thereupon plaintiffs Rothstein and Gurton proposed amendments to the by-laws for consideration at a membership meeting to be held in May. The effect of the Rothstein resolution was to rescind the result of the February referendum and to return the method of election of officers to that of voting in person. The Gurton resolution required that in order to be eligible to vote in a mail vote for election of officers, a member of the local would have to register in person at the office of the Secretary of the local during business hours in the month of September.
 
 
 4
 It appears that the great majority of members of Local 802 are not employed full time as musicians. On the contrary many are employed in other lines of work. When voting in person is required, only a small proportion of the members appear to vote. The requirement of registration in person, particularly registration during regular business hours, would make voting impossible for a large number of members. It is the purpose and design of the plaintiffs and others who are "working members" of the local, i. e., members who are employed full time as musicians, to get and hold control of the local by effectively disenfranchising the other members. The Rothstein and Gurton resolutions were devised to further this end.
 
 
 5
 The Local 802 Executive Board refused to put the Rothstein and Gurton resolutions on the agenda for the May meeting. Rothstein and Gurton thereupon brought an action to compel the officers of Local 802 to put the resolutions on the agenda. Judge Levet ordered the officers to put the resolutions on the agenda. Gurton v. Manuti, 235 F.Supp. 50 (S.D.N.Y.1964).
 
 
 6
 About 1500 members of the local attended the May meeting. The Rothstein and Gurton resolutions were adopted by a majority vote.
 
 
 7
 The officers of Local 802 appealed the action of the meeting to the International Executive Board of the Federation.
 
 
 8
 The International Executive Board, acting under Article 8, Section 12, of the By-Laws of the American Federation of Musicians which authorizes an appeal when a meeting has taken a stand "in violation of the principles of the Federation," declared the two resolutions to be null and void. The Board held that the resolutions violated Article 12, Section 6, of the By-Laws of the International. This Section provides:
 
 
 9
 "A Local failing to enforce its own laws, or submitting to unjust, unfair or improper conditions forced upon it by the arbitrary ruling of packed meetings, or through the influence of members who control the situation, must, after a proper investigation, submit to such decision arrived at by the officers of the Federation as, in their opinion, may correct the situation."
 
 
 10
 The Board's decision said that the "purpose of that Section [i. e. Section 6] is to prevent a minority from seizing control of a local by abuse of temporary power and effectuating changes adversely affecting the rights of the majority."
 
 
 11
 "These same considerations," the decision continues, "in our opinion, make it unlawful for the members at a meeting to disenfranchise the vast bulk of Local 802 members. For example, the Gurton resolution would make ineligible not only those members who live out of town but also those who work out of town during September and even those members who, though in town, must (unfortunately) find full-time employment in other industries and therefore cannot come to the Local's offices when they are open. Where the membership of the local has voted to maximize the opportunities for voting, a minority cannot be permitted to nullify their decision. We hold that the Federation By-Laws do not permit a minority thus to disenfranchise the majority."
 
 
 12
 The complaint in the Gurton action asks that the Local's officials be ordered to act in accordance with the Rothstein and Gurton resolutions. Jurisdiction is alleged to be based upon Section 501 of the Labor-Management Reporting and Disclosure Act.[1] The complaint in the Guarnaccia action asks that the ruling of the International Executive Board be declared invalid, that the officials be prevented from "effectuating" that ruling, and that the Rothstein and Gurton resolutions be declared to be valid amendments to the by-laws of Local 802. Jurisdiction is based upon Section 101 of the L.M.R. D.A.[2] Both sets of plaintiffs moved for temporary injunctions ordering the Union's officials to put the disputed resolutions into effect.
 
 
 13
 We hold that the applications for temporary injunctions were properly denied.
 
 
 14
 The facts set forth in the complaints do not constitute violations of Sections 101 and 501 of the L.M.R.D.A.
 
 
 15
 The only violation of Section 101 claimed by the plaintiffs is a denial of the equal right to vote in elections or referendums. The plaintiffs argue that if they are not allowed to vote in accordance with the limitations on voting contained in the Rothstein and Gurton resolutions, they will be denied their right to vote. But the guaranty of the equal right to vote is surely not a general commission for the federal courts to review the constitution and by-laws of the union. As long as no claim is made that provisions of the constitution and by-laws are being applied in such a way as to deny equality in voting, there is nothing in Section 101 which authorizes consideration of those documents. Section 101 grants no power to the courts to examine into whether by-laws were lawfully adopted or repealed. See Calhoon v. Harvey, 85 S.Ct. 292 (U.S. Dec. 7, 1964); Robins v. Rarback, 325 F.2d 929 (2d Cir.1963).
 
 
 16
 It is equally clear that Section 501 of the L.M.R.D.A. has no application to the present controversy. A simple reading of that section shows that it applies to fiduciary responsibility with respect to the money and property of the union and that it is not a catch-all provision under which union officials can be sued on any ground of misconduct with which the plaintiffs choose to charge them.[3] If further corroboration for this position be needed it will be found in the legislative history and in the law review articles cited by Judge Tenney in his opinion in the district court. 234 F.Supp. at 442-443.
 
 
 17
 The provisions of the L.M.R.D.A. were not intended by Congress to constitute an invitation to the courts to intervene at will in the internal affairs of unions. Courts have no special expertise in the operation of unions which would justify a broad power to interfere. The internal operations of unions are to be left to the officials chosen by the members to manage those operations except in the very limited instances expressly provided by the Act. The conviction of some judges that they are better able to administer a union's affairs than the elected officials is wholly without foundation. Most unions are honestly and efficiently administered and are much more likely to continue to be so if they are free from officious intermeddling by the courts. General supervision of unions by the courts would not contribute to the betterment of the unions or their members or to the cause of labor-management relations.
 
 
 18
 In the present case, the controversy was handled within the union without any irregularity but with due regard for the procedures provided by the bylaws. The action taken by a meeting of members of the local was appealed in the regular course to the International Executive Board, which exercises the power of the international organization between conventions. The Executive Board, having considered material submitted by both sides, came to the conclusion that the action of the meeting was "in violation of the principles of the Federation" within the meaning of Article 8, Section 12, of the by-laws of the Federation. The Board went on to find a violation of Article 12, Section 6, of the by-laws and to declare the action of the meeting null and void. We can find nothing in this procedure to which any exception can be taken. The provisions of the by-laws under which the International Board acted do not appear to us to be arbitrary or unreasonable and they are binding upon the plaintiffs as members of the union. The action which the Board condemned was the adoption, by a group constituting about five percent of the membership, of resolutions which were designed to disenfranchise a large majority of the union's members and which would have had that effect. There seems to us to be nothing arbitrary or reprehensible in the union's supreme governing body, acting under the authority of the union's by-laws nullifying that action.
 
 
 19
 The basic issue, whether the union is to be run by its "working members" or by the members who are not employed full-time as musicians and who constitute a great majority of the membership is surely an issue for the union to decide for itself and not an issue on which the power of the courts should be enlisted on one side or the other. So long as the union in reaching its decision violates no provision of law, we judges should resolutely keep our hands off.
 
 
 20
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 73 Stat. 535 (1959), 29 U.S.C. § 501 (Supp. V, 1964), which provides:
 "Fiduciary Responsibility of Officers of Labor Organizations
 "Sec. 501. (a) The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy.
 "(b) When any officer, agent, shop steward, or representative of any labor organization is alleged to have violated the duties declared in subsection (a) and the labor organization or its governing board or officers refuse or fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization, such member may sue such officer, agent, shop steward, or representative in any district court of the United States or in any State court of competent jurisdiction to recover damages or secure any accounting or other appropriate relief for the benefit of the labor organization. No such proceeding shall be brought except upon leave of the court obtained upon verified application and for good cause shown, which application may be made ex parte. The trial judge may allot a reasonable part of the recovery in any action under this subsection to pay the fees of counsel prosecuting the suit at the instance of the member of the labor organization and to compensate such member for any expenses necessarily paid or incurred by him in connection with the litigation.
 "(c) Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both."
 
 
 [2]
 73 Stat. 522 (1959), 29 U.S.C. § 411 (Supp. V, 1964)
 
 
 [3]
 See note 1 supra
 
 
 LUMBARD, Chief Judge (concurring):
 
 21
 I concur in the result. I agree with the majority's general definition of our role in this case — that we should not dictate Local 802's choice between election by referendum and election at a membership meeting but should only insure that the choice is made in a manner which does not violate the rights of individual members under § 101(a) (1) of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 411(a) (1). I also share with the majority their conclusion that the plaintiffs have failed to show a violation of their § 101(a) (1) rights in this case. In proceeding summarily from premise to conclusion, however, I think that my colleagues pass over the difficult question involved in this case.
 
 
 22
 First, while the majority seems to me unjustly to cast the plaintiffs as villains in a struggle to vindicate democratic principles, I do not read their opinion as suggesting that the Gurton and Rothstein proposals could not lawfully be adopted; indeed, any such suggestion would go beyond the limits which they have set on our role. It seems to me equally clear that adoption of the proposals was proper under the Local 802 bylaws. The bylaws provide for their own amendment by referendum or by vote at one of several bylaw meetings throughout the year. Since the two methods of amendment are independent of one another, a bylaw adopted by one may be repealed by the other, and this is just what the plaintiffs proposed. Of course, a vote at a membership meeting is likely to be smaller than a referendum vote. I assume, however, that the majority would agree that it is not for this court to say that it is improper for a union thus to conduct its affairs. Many responsible organizations, including the Association of the Bar of the City of New York, require their members to come to the meeting place in order to vote on any proposition.
 
 
 23
 Second, it is doubtful that the adoption of the proposals was improper under the Federation's bylaws; at the very least, this was a disputed issue of fact which, if material, could not properly be resolved in the summary proceedings held before Judge Tenney. Article 12, Section 6 — quoted by the majority — by its terms requires something in the nature of a "packed" or "controlled" meeting; certainly it contains no suggestion that a vote is improper simply because it was conducted at a meeting and a different result would have been likely if all absent members had been polled. A union tribunal should be given considerable latitude in interpreting union rules. But if there would be an infringement of a statutory right absent a justifying union rule, we must require that the interpretation of the rule at least be plausible and that its application be supported by some evidence where it depends, as in this case, on a factual premise. No evidence that the May meeting was packed, controlled or otherwise improperly constituted appears in the district court record.
 
 
 24
 The other bylaw provision cited by the International Executive Board was Article 8, Section 12:
 
 
 25
 "A Local officer or officers may appeal to the International Executive Board from a decision of a Local in any case whatsoever, if in the opinion of such officers, a meeting, for any reason or conditions whatsoever, took a stand in violation of the principles of the Federation. If the Board sustains the appeal, then it shall correct the situation, and its decision shall be binding upon the Local."
 
 
 26
 In holding the May vote invalid under this section, the Board rested most specifically on the fact that the February referendum provided that it could be amended only by another referendum vote. What the Board appears to have overlooked, however, is that the bylaw approved in the February referendum was not yet effective at the time of the May meeting.[1] The meeting thus was conducted under the pre-referendum bylaws, which allow amendment of any bylaw by vote at a bylaw meeting.
 
 
 27
 The Board's decision, so far as it rests on Article 8, Section 12, thus ultimately must depend on the general proposition that it "violates the principles of the Federation" for a vote at a membership meeting to supersede a larger referendum vote. I do not suggest that a union may not cherish such a principle or that it may not preserve it by application of a general bylaw such as Article 8, Section 12. But, again assuming that the plaintiffs would be entitled to relief if the defendants' acts were not justified by a union bylaw, we surely must require the union to offer some evidence that the principle antedates the current controversy or, at least, allow the plaintiffs to show that it does not do so.[2]
 
 
 28
 The foregoing excursion through the bylaws of the American Federation of Musicians and its Local 802 was made in an attempt to demonstrate that affirmance, though proper, cannot rest on the simple ground that the defendants acted properly under union rules. The more difficult question presented is whether the equal right to vote guaranteed by § 101(a) (1) is infringed if union officers, acting without justification from the union bylaws, void the result of a properly-conducted vote. This question cannot be answered by reference to the statutory bar on private post-election remedies found in § 403 of the Act, 29 U.S.C. § 483, for that section does not apply where the vote is not part of a union election. For the same reason, the recent decision of the Supreme Court in Calhoon v. Harvey, 375 U.S. 991, 84 S.Ct. 633, 11 L.Ed.2d 478 (1964), reversing 324 F.2d 486 (2 Cir. 1963), at least does not directly control; the apparent rationale of that decision is that the specific guarantees of § 401, 29 U.S.C. § 481, with respect to union elections preclude the inference of similar rights in § 101 (a) (1).
 
 
 29
 It would be disingenuous, however, not to find in Calhoon v. Harvey, the more general principle that § 101(a) (1) protects the right to vote only against relatively direct attack. I reluctantly conclude, therefore, that the more indirect attack involved in this case — arbitrarily voiding the result of a vote after it is taken — does not infringe the rights of the plaintiffs under § 101(a) (1).
 
 
 
 Notes:
 
 
 [1]
 Under the Local bylaws, an amendment approved in a referendum does not become effective until after the following bylaw meeting. The next bylaw meeting following the February referendum was the May meeting
 
 
 [2]
 Cf. N. A. A. C. P. v. Alabama, 357 U. S. 449, 454-458, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), in which a purported independent and adequate state ground was found not to have appeared in earlier Alabama decisions. Here, as in that case, there is involved a potential conflict between federally-created rights and local automony