Leo L. **PHILLIPS**, Appellant,

v.

Floyd **OSBORNE** et al., Appellees.

No. 21791.

United States Court of Appeals
Ninth Circuit.

Nov. 12, 1968.

Don S. Willner (argued), of Willner, Bennett, Leonard & Burns, Portland, Ore., MacDonald, Hoague & Bayless, Seattle, Wash., for appellant.

James Hubbard (argued), of Bassett, Donaldson & Hafer, Seattle, Wash., for appellees.

Before JERTBERG, BROWNING and ELY, Circuit Judges.

ELY, Circuit Judge:

This case presents a question as to the scope of federal jurisdiction conferred by Section 501 of the Labor Management Reporting and Disclosure Act of 1959, popularly called the Landrum-Griffin Act, 29 U.S.C. § 401 et seq. (hereinafter the "Act").

The appellees were sued in their capacity as officers of Local 580, an affiliate of the International Brotherhood of Pulp, Sulphite & Paper Mill Workers, AFL-CIO (hereinafter "International"). International is a labor organization representing some 170,000 employees engaged in the production of pulp and paper throughout the United States and Canada. Until the fall of 1964, West Coast employees were represented by International as a single collective bargaining unit under a single collective bargaining agreement known as the Uniform Labor Agreement (hereinafter the "ULA").

In May 1964, some of the members and officers of certain local affiliates became dissatisfied with International and formed a new organization known as the Association of Western Pulp and Paper Workers (hereinafter "Western"). Immediately following its initial formation, Western engaged in an active campaign to persuade all the local unions affiliated with International to disaffiliate and join the new organization. These efforts were successful, and a National Labor Relations Board (NLRB) election was conducted in the late summer of 1964. The results of the election, announced on September 23, 1964, led to the NLRB's certification of Western as the bargaining representative in early October 1964.

Local 580 had remained affiliated with International throughout the election campaign. However, on the evening of the day on which the election results were announced, a motion was made during the regular meeting of Local 580 to disaffiliate from International. This motion was ruled out of order and a discussion concerning funds belonging to Local 580 ensued.

On the following day there was a meeting of the appellee officers of Local 580 and representatives of International. Fearing that the membership of Local 580 would eventually disaffiliate from International and take the local's assets to the Western group, the appellees decided to place certain items in escrow on the following day, September 25, 1964. In effect the escrow agreement undertook to place these assets under the control of International and beyond the reach of the Local 580 membership.

On the morning of September 26, 1964, Local 580 held a meeting for the stated purpose of discussing Local 580's funds. Upon learning of the escrow arrangement which had been completed the day before, the membership adopted a motion that "this local does not ratify the action taken by the officers without the knowledge of the local and [sic] return the money." The president of Local 580 then told the membership that the funds would not be returned. A motion that the funds be disbursed directly to the membership was then passed, whereupon the meeting adjourned.

Immediately following this meeting, a second meeting was convened, and those present voted to disaffiliate from International and join Western. This meeting was then adjourned and a third meeting

called to order. At this meeting the appellant Phillips was nominated and elected president of Local 580 affiliated with Western.[1]

Phillips grounded his suit upon Section 501 of the Landrum-Griffin Act, alleging that the above actions of the appellees constituted a breach of their fiduciary duties within the meaning of the Act. The District Court held that Phillips could not bring this suit under Section 501(b) because he was not a "member" of Local 580 affiliated with International at the time he instituted suit. The court decided that by voting in favor of affiliation with Western and by accepting the presidency of Western Local 580, Phillips had unequivocally withdrawn from International Local 580. We affirm the District Court's construction of Section 501 as well as its factual determination that Phillips was not a "member" of Local 580 for purposes of the section when he brought suit.

■■ The Landrum-Griffin Act confers federal jurisdiction in actions against union officers for breach of fiduciary duties described in Section 501(a) of the Act.

"(b) When any officer, agent, shop steward or representative of any labor organization is alleged to have violated the duties declared in subsection (a) of this section and the labor organization or its governing board or officers refuse or fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization, such member may sue such officer, agent, shop steward, or representative

in any district court of the United States or in any State court of competent jurisdiction to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization. * * *"

29 U.S.C. § 501(b) (1959). In determining the scope of jurisdiction conferred by this section, we must remain mindful of the fact that the jurisdiction of federal courts is defined, and limited, by the Constitution and congressional action. Hence, statutes extending federal jurisdiction, such as Section 501(b), are narrowly construed so as not to reach beyond the limits intended by Congress. Healy v. Ratta, 292 U.S. 263, 270, 54 S.Ct. 700, 78 L.Ed. 1248 (1933); Kline v. Burke Constr. Co., 260 U.S. 226, 233–234, 43 S.Ct. 79, 67 L.Ed. 226 (1922). Such a construction is especially appropriate when, as here, the statute generally concerns rights subject to full and satisfactory vindication in state courts.[2]

When Congress enacted the Landrum-Griffin Act, it was manifestly concerned with regulating the internal affairs of labor unions. The Act was a response to the report of the Select Committee on Improper Activities in the Labor Management Field, more popularly known as the McClellan Committee Report. This Committee uncovered widespread practices of misappropriation of union funds and illicit profits by union officers, as well as repeated instances of violence and racketeering. See Interim Report of the Select Committee on Improper Activities in the Labor Management Field, S.Rep. No. 1417, 85th Cong., 2d Sess. (1958). The entire thrust of the Committee's report was that if unions became internally

1. There were two representatives of Western, as well as one of Western's attorneys, present at this series of meetings. The trial court concluded from conflicting evidence that the Western Association had, through its officers or counsel, directly or indirectly prearranged the important steps which were taken on the morning of September 26, 1964.

2. In his brief, appellant reveals that more than forty other lawsuits have been

filed in connection with the controversy between International and Western. Apparently these disputes also involve assets and funds which formerly belonged to International affiliates, and are pending, or have been resolved, in state courts. The appellant has failed to explain why a state court may not satisfactorily determine the ownership of the funds involved in the present controversy.

democratic, many of the abuses would be eliminated. In its recommendations, the Committee stated:

"Much that is elicited in the Committee's findings of misconduct by union officials can be substantially improved, in the committee's view, by a revitalization of the democratic processes of labor unions." [3]

The congressional history of the Landrum-Griffin Act makes it abundantly clear that Congress sought to implement the recommendations of the Committee and intended to deal solely with the activities of union leaders as they affected their members. The original bill, the Kennedy-Ervin bill, did not contain a so-called bill-of-rights for union members. S. 1555, 86th Cong., 1st Sess. (1959). This lack of protection for union membership prompted Senator McClellan to call for amendment of the bill.

"[I]t does not afford adequate sanctuary to the exploited and the oppressed. I propose, therefore, Mr. President, to offer some strong amendments —amendments that will be in the interests primarily of workers—of union members and for their protection; amendments designed to insure greater integrity in the administration and management of union affairs. * * * " [4]

It was in the House of Representatives that the Landrum-Griffin substitute for the original Senate bill was introduced. H.R. 8400, 86th Cong., 1st Sess. (1959). The changes which were made did not affect the central purpose of the legislation. Senator Griffin, during House debate on his bill, remarked that "The labor reform legislation before the House at this time is directed at the regulation of the internal affairs of unions." 105 Cong.Rec. 15722 (1959).

Although the Act sought to eliminate abuses of unscrupulous leaders, it was recognized that the activities of a comparatively few should not inspire broad legislation which would unnecessarily restrict the power of labor organizations and their members. The Senate Committee Report on the Landrum-Griffin Bill alluded to the need for restraint.

"In acting on this bill the committee followed three principles:

"1. The committee recognized the desirability of minimum interference by Government in the internal affairs of any private organization. Trade unions have made a commendable effort to correct internal abuses; hence the committee believes that only essential standards should be imposed by legislation. Moreover, in establishing and enforcing statutory standards great care should be taken not to undermine union self-government or

---

3. Interim Report of the Select Committee on Improper Activities in the Labor Management Field, S.Rep.No. 1417, 85th Cong., 2d Sess., 452 (1958).

A member of the Committee, Senator Curtis, argued:
"It is my firm belief that if the real power in a union is vested in the rank and file of its members, that accomplishment alone will eliminate a great portion of all the abuses and misuse of funds and misuse of power and the other offenses which all of us must frown on. * * * "
105 Cong.Rec. 5862 (daily ed. April 23, 1959).

4. 105 Cong.Rec. 6472 (1959).
During debate over the amendments, Senator McClellan added:

"Mr. President, I do not believe that racketeering, corruption, abuse of power, and other improper practices on the part of some labor organizations can be, or will ever be, prevented until and unless the Congress of the United States has the wisdom and the courage to enact laws prescribing minimum standards of democratic process and conduct for the administration of internal union affairs."
105 Cong.Rec. 6471 (1959).
The Kuchel substitute for the McClellan bill-of-rights was subsequently introduced. The debates concerning Senator Kuchel's proposal reflect the same interest in improving the power of the union member to exercise his rights effectively within his own organization. See 105 Cong.Rec. 6717–27 (1959).

830

weaken unions in their role as collective-bargaining agents. * * * "

2 United States Code Cong. & Admin. News 2323 (1959).

■ It has been recognized that the broad language of Section 501(a), imposing fiduciary duties upon union officers, potentially invites undue government interference. Hence, when dealing with this section, the courts have been especially careful to confine their role to areas which are clearly within the intended reach of the Act. For example, in Gurton v. Arons, 339 F.2d 371 (2d Cir. 1964), the court refused to extend federal jurisdiction under Section 501 to breaches of fiduciary duties involving activities unrelated to the money or property of the union. It was declared that fiduciary responsibility under the Act "is not a catch-all provision under which union officials can be sued on any ground of misconduct with which the plaintiffs choose to charge them." 339 F.2d at 375.

■ Specific clauses of Section 501 (b) have been held to reflect the congressional purpose to limit federal jurisdiction. Section 501(b) provides in part that "[N]o such proceeding shall be brought except upon leave of the court obtained upon verified application and for good cause shown * * *." This portion of the section is deemed to have created a condition precedent. Thus, in Horner v. Ferron, 362 F.2d 224 (9th Cir. 1966), our court declared that the "good cause" provision was a condition precedent to Section 501 suits, a condition which was designed to protect unions and their officers from harassing, vexatious litigation. 362 F.2d 228.[5]

In addition to the "good cause" provision, other clauses of Section 501(b) have been construed as imposing conditions precedent to suit. Under Section 501(b), a plaintiff may bring an action only if "the labor organization or its governing board or officers refuse or fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so * * *." In Coleman v. Brotherhood of Railway & Steamship Clerks, Etc., 340 F.2d 206 (2d Cir. 1965), the court held that a request for action by the "organization or its governing board or officers" was a mandatory condition precedent to a Section 501 suit. Moreover, the court construed this provision quite strictly by declaring that the condition required that an actual request be made and that a mere allegation that a request would be futile would not satisfy the Section 501(b) requirement. Finally, along with requiring the making of some request, it is a prerequisite to federal jurisdiction that the union must have evidenced a refusal to comply with the request. Penuelas v. Moreno, 198 F.Supp. 441 (S.D. Cal.1961). Here, the District Court correctly concluded that union membership on the part of a plaintiff is another condition precedent to his filing a Section 501 suit in the federal court. Indeed, in our case of Horner v. Ferron, supra, we in effect declared that this was true:

"[T]hus if the defendant can establish * * * facts which demonstrate that the plaintiff *is not a member of the defendant union,* or that the action is outlawed by a statute of limitations, or that the action cannot succeed because of the application of the principles of *res judicata* or collateral estoppel, or that plaintiff has not complied with some controlling condition precedent to the bringing of such a suit, then although these defects do not appear on the face of the complaint, they may warrant denial of the application."

362 F.2d at 229 (Emphasis added.)

5. See also Highway Truck Drivers & Helpers Local 107 v. Cohen, 182 F.Supp. 608, 622 n.10 (E.D.Pa.), aff'd 284 F.2d 162 (3d Cir. 1960). It has also been suggested that "good cause" was a condition precedent to Section 501 suits not only because Congress desired to protect union leaders against harassment, but also because of its desire to spare federal courts from undue increase in their already heavy burden of civil litigation. Penuelas v. Moreno, 198 F.Supp. 441 (S.D. Cal.1961).

■ The appellant vigorously argues that he was a member of International Local 580 at the time suit commenced. He bases this argument on certain membership provisions in International's Constitution and By-Laws.[6] Apart from these provisions, the District Court concluded that Phillips, by his conduct, voluntarily relinquished his membership in International[7] for purposes of Section 501 suits. We are not persuaded that this determination was erroneous. In the light of Phillips' relation with Western, other considerations lead us to agree that he, at the time he filed his suit, was not a "member" of International within the meaning of Section 501(b).

■ The general purpose of the Act, seeking to further union democracy and thereby prevent misuse of power by union leaders, is analogous to regulations designed to control corporate officers through "shareholder democracy." See Gilbert, Dividends and Democracy (1956). See also Emerson & Latcham, Shareholder Democracy (1954). Hence when Congress sought to design the procedures by which union members could effectively perform their "policing function" within their organization, it apparently turned to the concept of the shareholders' derivative suit.[8] The basic principle of the derivative suit is that the duties allegedly violated by corporate officers are owed to the organization and only secondarily or derivatively to the shareholder as representative of all shareholders. Section 501(a), establishing the duties of labor officers, adopts this concept in its very first sentence.

"The officers, agents, shop stewards, and other representatives of a labor organization *occupy positions of trust in relation to such organization and its members as a group.*"

29 U.S.C. § 501(a) (1959) (Emphasis added.)

In the derivative context, a necessary corollary of the principle that the duties of officers are owed to the organization is that any relief obtained by the plaintiff in such litigation shall benefit the corporation as a whole and not the suing individual directly. Correspondingly, Section 501(b) makes it clear that relief granted under Section 501 is for the benefit of the real party in interest, the union whose officers are charged with dereliction.

"[A] member may sue such officer, agent, shop steward, or representative in any district court of the United States or in any State court of competent jurisdiction *to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization.*"

29 U.S.C. § 501(b) (1959) (Emphasis added.)

It is indicated from the foregoing that a suit under 501 was intended to be primarily for the benefit of the union whose

---

6. The appellant maintains that he was a member of International at the time suit was commenced because he had paid his dues through the period in which suit was brought and was therefore a member in good standing by the definition of International's by-laws. Secondly, Phillips claims that he remained a member of International for the reason that while International's constitution provides that promoting or assisting in the organization of a rival union is grounds for expulsion, he had not been expelled before he filed his suit.

7. The court stated that Phillips' actions in voting in favor of disaffiliating with International and accepting the presidency of the new local affiliated with Western constituted an unconditional withdrawal from International.

8. Another court has suggested the analogy between Section 501 suits and derivative actions. In Nelson v. Johnson, 212 F. Supp. 233, 297–98 (D.Minn.), aff'd 325 F.2d 646 (8th Cir. 1963), Section 501(b) was compared with the derivative suit. The court declared that the analogy was strengthened by the repeated reference throughout the Act's history to the similarity between the duties of a union official and those of a corporate officer. See H.Rep.No. 741, 86th Cong., 1st Sess. 81 (1959), U.S.Code Cong. & Admin.News 1959, p. 2424; 105 Cong. Rec. A 6573 (daily ed. July 29, 1959).

officers are sued. The condition of membership, which is expressly required by the Section, seeks to insure that a representative of the union, the real party in interest, will properly represent the union's interests in the litigation. The existence of such "membership" as to authorize suit under Section 501, may, in circumstances like those here present, be negated by a showing that the plaintiff in such a suit cannot be fairly viewed as an agent for the interests of the affected union—here International. The District Court understood that this was the fundamental inquiry, and there is ample evidence to support its conclusion that Phillips was not acting on behalf of International. It should be emphasized, in this respect, that after voting to disaffiliate from International, Phillips did not institute his suit until several weeks after he had become the president of the rival, competing union. In addition, the record specifically discloses that the rival organization, Western, has financed the costs of the entire litigation with which we are concerned. In the light of all these circumstances, we agree with the District Court that Phillips was not a representative of International when he brought this action.

 There is yet another compelling reason to conclude that Phillips did not properly bring suit under Section 501. The Section specifically provides that a "member may sue * * * to recover damages * * * or other appropriate relief for the benefit of the labor organization." The appellant did not seek such relief. In his complaint he prayed that the moneys be distributed to certain members.

> " * * * for a joint and several judgment against the defendants for such sums as determined by such accounting to have been illegally transferred, and that said defendants be ordered to dis-

tribute equally said funds of Local 580 among the paid-up members of said Local as of September 26, 1964, and for an award of reasonable attorneys' fees and expenses of litigation."

In requesting direct relief for certain union members only and not "for the benefit of the labor organization," Phillips disqualified himself from proceeding under Section 501.[9]

Affirmed.

---

9. As an additional reason for its decision that it lacked jurisdiction, the District Court relied upon its finding that the appellant had not brought his suit within

a "reasonable time." We do not reach consideration of the validity of this conclusion, either factually or legally.