Anthony G. **PIGNOTTI**, as an Individual Member of Local #3 Sheet Metal Workers' International Association, Appellee,

v.

**LOCAL #3 SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION et al., Appellants.**

**No. 72-1411.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 12, 1973.

Decided April 20, 1973.

Donald Fisher, Toledo, Ohio, for appellants.

Edward F. Fogarty, Omaha, Neb., for appellee.

Before GIBSON and ROSS, Circuit Judges, and BENSON,* District Judge.

GIBSON, Circuit Judge.

This case concerns the merits and the applicability of §§ 411 and 501 of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 501 and 411,[1] (commonly referred to as the Landrum-Griffin Act) to an internal dispute between certain union members and certain of the officers of a Local and International Union. The District

Court of Nebraska, Judge Robert Denney, granted relief in an opinion reported in 343 F.Supp. 236 (D.Neb.1972).

Plaintiff Anthony Pignotti is suing as an individual member of Local Union Number 3, Sheet Metal Workers' International Association. There are six defendants; Local No. 3, Sheet-Metal Workers' International Association (Local No. 3); Sheet Metal Workers' International Association (International Association); Lester Foreman, Business Agent for Local No. 3; Walter Brader, President of Local No. 3; Edward J. Carlough, General President of the International Association; and David Todd, International Representative of the International Association and trustee of Local No. 3 under a trusteeship imposed by the International Association. The Omaha-Council Bluffs Sheet Metal Contractor Association and the Sheet Metal Workers' National Pension Fund (National Fund) were named defendants in the complaint but have been subsequently dismissed.

Under the collective bargaining agreement entered into on July 26, 1969, and running to May 31, 1972, the Contractor Association agreed that upon 30 days notice by Local No. 3, its members would begin deducting a designated amount from wages and pay that amount into a pension fund. A Pension

---

\* United States District Judge for the District of North Dakota, sitting by designation.

1. 29 U.S.C.A. § 411(a)(1) provides that: "Equal rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws."

29 U.S.C.A. § 501 provides in part: "(a) The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party or in any manner connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction or in behalf of the organization. . . ."

Committee was appointed by Local No. 3 to study the various alternative pension arrangements. The committee met at various times from February 19, 1970, until December 18, 1970. The original members of the committee were Robert Wild, James Pignotti, the brother of the plaintiff, James Newberger, and Robert Holtz. At a later date Robert Wild left the committee and was replaced by defendant Walter Brader (president of the Local) who appointed himself to the committee. The committee contacted a number of major insurance companies and received proposals from at least two of them. In addition the committee heard proposals from a savings and loan association and from the National Fund.

The committee submitted a final report in January 1971. The members of the committee were not in agreement. Three pension plans, including the National Plan were sent by mail to the membership of Local No. 3 accompanied by letters of position by each of three of the four members of the pension committee. (James Pignotti for some reason was not included). A special meeting was called for March 25, 1971, "to vote for or against a pension plan," and if approved, "the amount of money to be contributed and the month contributions will begin." The motion put by defendant Lester Foreman, however, was to adopt the National Plan. On a standing vote the motion was defeated, 66 for to 93 against.

At the next regular meeting, April 1, 1971, a motion was made to have a special order of business at the next regular meeting to vote on the question "to have or not to have a pension plan." That motion carried. In the interim on April 20, 1971, a petition was presented in proper form to President Brader requesting a special membership meeting to vote by secret ballot whether "to commence contributing 20¢ to the [National Plan] on June 2, 1971." Brader stated that he did not honor the petition at that time because of the special order of business which would vote on the plan at the next regular meeting.

That meeting was held on May 6. The motion was orally submitted to the members whether to have any plan. The vote was taken by secret ballot with the voters writing either yes or no on a blank piece of paper. There were 58 "no" votes and 43 "yes" votes. After this motion had been disposed of a motion was made by James Pignotti "to postpone indefinitely the pension plan and reference thereto (Rule 23)."[2] The vote on this motion by show of hands was announced by Walter Brader as 24 "for" and 29 "against." A division of the house was called for and the vote taken again with the result of 60 "for" and 30 "against" the motion. Thus the motion passed.

President Brader wrote to the International Association to inquire whether the procedure followed at this meeting was proper. He was answered by Lonnie Gaither, assistant to General President Carlough, and advised that the motion to postpone indefinitely was out of order because no main motion was pending at the time of the motion[3] and that the vote by a division of the house was not proper because he had already declared the vote on the question before the vote by division of the house was called for under Rule 27 of the Ritual.

Brader then decided to honor the petition for the special meeting which had been presented to him on April 20. The announcement of the meeting was by post card and read:

"The purpose of this meeting will be to vote by secret ballot for Sheet Metal Workers No. 3 to commence con-

---

2. The reference to "Rule 23" is a reference to Rule 23 of the Ritual of the International Association which reads: "When a question is postponed indefinitely, it shall not come up again except by two-thirds vote."

3. The Union cites Robert's Rules of Order as authority for this ruling. Robert's Rules are made applicable to the Local under Rule 5 of the Ritual.

tributing 20¢ to the Sheet Metal Workers National Pension Plan on June 2, 1971."

After this meeting was called to order but before a vote could be taken on the pension plan, Jess Steward raised a point of order challenging consideration of the pension plan on the grounds that "the issue was defeated at the last regular meeting, and this meeting constitutes a motion to reconsider and this is out of order." President Brader overruled the point of order. The chair was challenged and the challenge upheld by a vote of 51–50. A motion to adjourn was made, a point of order raised against the adjournment and overruled by the chair, and the motion to adjourn passed. No vote on the pension plan was taken at this meeting. A protest against the adjournment was made to General President Carlough by a member present at the meeting. Brader also wrote to Carlough and asked if the International Association could exercise its powers to call a special meeting to vote on the pension plan.

On June 11, 1971, the representative of the International Association, Eugene Edwards, notified the officers of Local No. 3 that he was calling a special membership meeting of the Local for June 21. On June 15, written notice of this meeting was mailed to the entire membership. The meeting took place and 151 members signed in. There were 77 votes for participation in the National Plan, 71 against participation and 3 votes were not counted as incorrectly marked. On June 29 President Brader gave notice to the Contractor Association that the plan was to be put into effect as of August 1.

A petition was then circulated by the anti-pension group and on July 15 it was presented to Brader. It was signed, as required, by more than 10 per cent of the membership of Local No. 3 and called for a special meeting "for the purpose of voting down the pension contributing plan previously passed on June 21, 1971." Receiving no response to this petition, a complaint was filed on July 26, 1971, in the United States District Court for the District of Nebraska asking the Court to require a special meeting of Local No. 3. This suit was dismissed by the Court on August 31, 1971, for failure to state a claim.

A special membership meeting was called for October 22, 1971, pursuant to the petition. The members voted by secret ballot. The vote was 175 against retaining the National Plan and 119 in favor of the Plan.

On October 20, Brader sent a telegram to the Contractor Association requesting a meeting about the pension plan. No response was received to this communication. A second telegram was sent on November 17 and the Contractors responded agreeing to the meeting. The meeting was held on December 2. The Contractor Association agreed to reopen the contract to delete the pension plan but stated that they would require the Union to accept three conditions.[4] Local No. 3 requested an opinion from its attorney on the contractors' conditions and he submitted an opinion letter on January 3, 1972, in which he advised against agreeing to these conditions.

On January 4, 1972, Local No. 3 was placed under a trusteeship by General President Carlough. David Todd, an International Representative, was trustee. On March 23, 1972, the General Executive Council ratified and approved this action. There was no opposition to the trusteeship presented to the Council.

4. The conditions were:
 "1. It [the request] is made in writing and in such a manner that it needs no further union ratification to complete the re-opening and execution of all necessary documents. ·
 "2. The pension trustees release the contractor's association from all liability for the deletion and the union agrees to hold the association and it's [sic] members harmless from any liability from deletion of the pension trust.
 "3. In the event agreement is reached to delete the pension provision as requested it will be conditioned that the pension cannot be reinstated during the remainder of this contract."

David Todd has indicated that he will continue the Local's participation in the pension plan.

The foregoing is a chronology of the events which led this dispute to the United States District Court. From these facts and the other findings of fact that Court found:

". . . defendants, Carlough, Brader and Foreman, early in 1971 set out to obtain the participation of Local #3 in the National Plan, whether the majority of the Union wanted the Plan or not * * * that the purpose of the trusteeship was to prevent any further action of the members toward implementing the vote to discontinue the Plan." Pignotti v. Local No. 3 Sheet Metal Workers Int. Ass'n, 343 F.Supp. 236, 242–243 (D.Neb.1972). The Court further found that these activities constituted violation of both § 411 and § 501 and ordered relief as follows:

(1) The defendants are jointly and severally liable for damages in the amount deducted from the wages of the members of Local No. 3 since August 2, 1971, and paid to the Sheet Metal Workers' National Pension Fund.[5]

(2) Defendants are required to cease within 30 days participation on the part of the members of Local No. 3 in the Sheet Metal Workers' National Pension Fund.

(3) Defendants are enjoined from negotiating into any new contract any pension provision more binding than the one contained in the contract of July 26, 1969.

(4) Defendants are enjoined from dissolving Local No. 3 in order to assign its members to locals that do participate in the National Plan.

Appellants claim that certain of the findings of fact by the trial court are clearly erroneous. Although appellants' presentation of these issues lack specificity in some instances, we have reviewed the objections and think the District Court's findings of fact have sufficient evidentiary support in the record. They are, therefore, not clearly erroneous.

Appellants' legal arguments on this appeal can be divided into four areas. (1) The nature of the pension plan as the subject of collective bargaining brings it outside the scope of the Landrum-Griffin Act. (2) The appellants did not violate § 411. (3) The appellants did not violate § 501. (4) Some members of the Union may have now acquired vested rights in the pension plan which cannot be destroyed since they are not parties to this action.

## COLLECTIVE BARGAINING

Appellants' collective bargaining argument is that participation or non-participation in the pension plan is a collective bargaining issue rather than an internal union issue and that only internal union issues are the proper concern of the Landrum-Griffin Act. This argument is not well taken. The action seeks to preserve the democratic processes in Local No. 3, a proper subject of concern under the Landrum-Griffin Act. The issue raised is whether the method used by the Union officials to secure the Local's participation in the plan, violated §§ 411 and 501 of the Act.

## SECTION 411

Appellants argue that each and every step in the passage of the Pension Plan was in accord with the International's Constitution and by-laws

---

5. The Court held that if the defendants could legally recover the amount of this judgment that had been paid into the Pension Fund, such amount could be used to satisfy this judgment. The funds are to be put into an escrow account. Following the new contract, if the parties can agree to a new and final vote on the question of participation in a pension fund such shall be held. If the vote favors participation the funds are to be paid from the escrow account to the particular fund chosen. If the vote opposes participation or if no agreement can be reached on having a vote the money is to be paid pro rata to the members of Local No. 3 from whose paychecks the funds were deducted.

(including Robert's Rules of Order), and thus cannot constitute a violation of § 411. They argue that far from denying democratic participation in the union affairs to the members of the local that they actually preserved such rights by their actions.[6] Appellants cite Vestal v. Hoffa, 451 F.2d 706, 709 (6th Cir. 1971), cert. denied, 406 U.S. 934, 92 S. Ct. 1768, 32 L.Ed.2d 135 (1972) for the proposition that the union officials and not the courts are the proper parties to interpret the union's constitution. We agree generally with this proposition of law, provided, as recognized in *Vestal*, that the interpretations are fair and reasonable. But we also recognize, as did the Court in Sabolsky v. Budzanoski, 457 F.2d 1245 (3d Cir.), cert. denied, 409 U. S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96 (1972) that "[C]ourts have not hesitated to strike down so-called 'authorized' union conduct, alleged to be based on a rule or by-laws fairly interpreted, where such conduct violates the provisions of the Landrum-Griffin Act." 457 F.2d at 1252. In our own case of Johnson v. Nelson, 325 F.2d 646 (8th Cir. 1963) we cut past the question of whether the interpretation of the by-laws and constitution of a union was "authorized" to determine whether the conduct of the union officials, in refusing to act according to the majority vote of the membership, constituted a violation of their § 501 fiduciary duties. The Act does not permit the violation of rights guaranteed to union members under § 411 upon a showing that the violation was in accord with the union's constitution and by-laws.

Appellants further argue that the allegation by the plaintiffs and the finding by the Court that the trusteeship was imposed for the purpose of preventing any further action by the members to implement the vote to withdraw from the National Plan was in effect an impermissible collateral attack on the trusteeship and not a direct attack as provided in § 464. Appellants contend that this deprived them of the benefit of the statutory presumption of validity which attaches to a trusteeship under § 464(c) for a period of 18 months, absent "clear and convincing proof" that the trusteeship was not established for a purpose allowable under the statute. Appellee correctly points out that the presumption is operative only in proceedings pursuant to that section of the Act attacking the validity of the trusteeship, and that Judge Denny did not invalidate the trusteeship but only found that it was established by Carlough for a purpose which was a violation of both § 411 and § 501. There was no finding that the ratification of the trusteeship by the International's Executive Council was for a purpose other than one allowed by the Act and thus the trusteeship is still valid.

We also note 29 U.S.C. § 466 provides that the remedies provided by the subchapter of which it is a part, which includes § 464, are not exclusive. Thus the right to sue under § 412 is not affected by the right to attack trusteeships under § 464. The 18-month presumption of validity for trusteeships is available only in proceedings under § 462.

The District Court held that Trustee David Todd violated § 411 by refusing to take steps to implement the October 22 vote to withdraw from the National Plan and by his expressed intention to incorporate the National Plan into the next contract which would be negotiated while he was trustee and thus not be subject to ratification by the membership of Local No. 3. The Court

---

6. Nevertheless it appears that the District Court's finding that plaintiff and the anti-pension group were unfairly treated by the Union's procedural decisions is correct. An example of this is the Union's position that the vote favorable to the plaintiff on the motion to postpone in-definitely was improper because the chair had already announced the vote. The primary purpose of a call for a division of the house is to test the chair's announcement of the vote in situations such as this where the chair's announcement was obviously incorrect.

recognized that a trusteeship suspends local autonomy for the duration of the trusteeship and that the trustee has no obligation to call meetings or allow the members to vote. However, the Court held that the trustee did have an obligation to carry out the vote which had been made prior to the imposition of the trusteeship. While we can find no cases on this issue, we believe that a trustee, as a fiduciary, has an obligation to correct the effects of past denials of rights guaranteed to union members by § 411, and his failure to correct these past injustices is in itself a violation of § 411 as well as being a violation of § 501. The Congressional impositions of fiduciary obligations upon agents and officers of unions would be meaningless if all of these duties could be abrogated by the mere device of imposing a trusteeship. Past wrongs call for a remedy, not technical objections.

### SECTION 501

■ Initially all parties agree that neither the International Association nor Local No. 3 have violated § 501 as that section imposes liability only on the individual union officials. See, Sabolsky v. Budzanoski, 457 F.2d 1245, 1249 (3d Cir.), cert. denied, 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96 (1972).

We are invited by the appellants to reconsider our holdings in Johnson v. Nelson, 325 F.2d 646 (8th Cir. 1963), concerning the scope of § 501(a), on the basis of contrary decisions in the Second and Ninth Circuits. In Johnson v. Nelson we were concerned with a situation similar to the one in the instant case. The court there found that because of personal feelings the officials of a local union had refused to pay certain attorney's fees that had been approved by a constitutional vote of the membership. Johnson viewed § 501 as imposing broad fiduciary duties on the officers, agents, shop stewards, and other representatives of a labor organization and that the officers by allowing their personal feelings to interfere with the performance of their duties "failed 'to refrain from

dealing with such organization [Local] as an adverse party or in behalf of an adverse party in any matter connected with his [their] duties' [§ 501(a)]." 325 F.2d at 653. These acts constituted a breach of their fiduciary duties imposed by § 501(a). The Second Circuit in Gurton v. Arons, 339 F.2d 371 (2d Cir. 1964) and Coleman v. Brotherhood of Ry. & Steamship Clerks, Freight Handlers, Express & Station Employees, 340 F.2d 206 (2d Cir. 1965), has restricted the scope of § 501(a) only to situations involving "money and property" of the union. The Ninth Circuit appeared to follow Gurton in Phillips v. Osborne, 403 F.2d 826 (9th Cir. 1968). However, that Court in a recent case explicitly held this issue to be an open one in that Circuit, stating:

> "The position of the court in Johnson v. Nelson that § 501 is not limited to breaches of trust directly involving officers' handling of union money or property has been termed the 'majority' view. Cefalo v. Moffett, 1971 [146 U.S.App.D.C. 117], 449 F.2d 1193, 1198 n. 15. The question remains open in this circuit. Our citation of Gurton v. Arons, supra, in Phillips v. Osborne, 9 Cir. 1968, 403 F.2d 826, 830, does not commit us to follow Gurton. We cited Gurton as merely illustrative of a point of view." Kerr v. Shanks, 466 F.2d 1271, 1275 n. 2 (9th Cir. 1972).

The reason for the difference in interpretation between Gurton and Johnson can be found in the interpretation of the legislative history of the Act as it was considered by each court.

The Second Circuit in Gurton, as to the legislative history of the Act, referred the reader to the opinion of the district court, Guarnaccia v. Kenin, 234 F.Supp. 429, 442 (S.D.N.Y.1964), which stated:

> "The legislative history of the Section would appear to also be in accord with defendants' position that the Section relates solely to questions of financial dealings. Thus during the

course of debate, Senators McClellan and Ervin made it quite clear that the Section would relate solely to matters of money and property. See II Leg. History 1129–31 (1959)."

This debate concerned the fiduciary provision included as § 501 of S. 1555, the Kennedy-Ervin Bill.

Our court in Johnson v. Nelson, 325 F.2d at 650, made a careful analysis of Title V of the Landrum-Griffin Act and concluded the explicit language of § 501(a) imposed a broad fiduciary obligation on union officers and representatives and approved the thorough and detailed analysis of the legislative history contained in the district court opinion in Nelson v. Johnson, 212 F.Supp. 233, 284–296 (D.Minn.1963). Judge Larson's analysis should be read for an in-depth understanding of the history of the Act. However, for the purpose of this opinion it will suffice to follow the Act from its introduction in the Senate to its ultimate passage.[7]

The original bill in the series was S. 1555 (the Kennedy-Ervin Bill). It was passed by the Senate containing a very narrow fiduciary provision, specifically pertaining to the handling of money and property of the labor organization by its officials. After passage by the Senate the bill was sent on April 25, 1959, to the House and referred to the Committee on Education and Labor.

Four separate bills were introduced in the House. (1) H.R. 7265 (the Kearns Bill) on May 20, (2) H.R. 8342 (the Elliot Bill) on July 23, (3) H.R. 8400 and H.R. 8401 (Identical bills introduced concurrently and known as the Landrum-Griffin Bill) on July 24 and (4) H.R. 8490 (the Skelly Bill) on August 3. These were all referred to the Committee on Education and Labor. The significant bills of this group were the Elliot Bill and the Landrum-Griffin Bill. The Elliot Bill contained a fiduciary provision as § 501 which was identical to the one in the present Act. The fiduciary provision in the Landrum-Griffin Bill was identical to the Elliot Bill. The Committee reported favorably the Elliot Bill on July 30. The Committee Report contained the following comments on § 501:

"The committee bill also contains provisions dealing with breaches of trust and other questionable transactions, which, although not seriously criminal nevertheless are incompatible with a strong and honestly run labor movement." I Leg.Hist. 768.

In the Supplementary Views by Representative Elliot and four other Members of the House it was stated:

"Union officials occupy positions of trust. They hold property of the union and manage its affairs on behalf of the members. It is the duty of union officers just as it is the duty of all similar trustees to put their obligations to the union and its members ahead of any personal interest.

"The committee bill sets forth this principle unequivocally and declares that union officers and agents occupy positions of trust in relationship to labor organizations and their members. It then sets forth their duties in terms which the common law applies to all persons who undertake to act on behalf of others:

" * * * to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted hereunder, to refrain from dealing with such organization as an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts

---

7. The legislative history of the Labor-Management Reporting and Disclosure Act of 1959 has been compiled by the National Labor Relations Board and published as a two volume set entitled Legis- lative History of the Labor Management Reporting and Disclosure Act of 1959. Citations relevant to legislative background will be to this set.

with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization.

"We affirm *that the committee bill is broader and stronger than the provision of S. 1555 which relate to fiduciary responsibilities.* S. 1555 applied the fiduciary principle to union officials only in their handling of 'money or other property' (See S. 1555, sec. 610), apparently leaving other questions to the common law of the several States. Although the common law covers the matter, we considered it important to write *the fiduciary principle explicitly into Federal Labor legislation. Accordingly the committee bill extends the fiduciary principle to all the activities of union officials and other union agents or representatives.*" I. Leg.Hist. 839 (emphasis added).

The additional Statement by Hon. Phil M. Landrum and Hon. Robert P. Griffin opposed the Elliot Bill in favor of their own substitute, the Landrum-Griffin Bill. But, of this substitute they said:

"In general, the substitute is framed on the bill reported by the committee; we have retained the committee's technical amendments and many other features of the committee bill which make a contribution to an effective labor reform measure. There are no 'strangers' in our substitute bill; every provision was thoroughly considered by the full committee." I Leg.Hist. 87.

On the floor of the House during debate, Representative Griffin made this statement concerning his bill:

"For a moment, I believe attention should be focused upon the similarities between the committee bill and the substitute, H.R. 8400. For example, in both bills, * * * title V— covering the fiduciary responsibility of union officers, bonding, loans, restrictions against the Communists and exconvicts holding office—[is] identical without a word or a comma changed." II Leg.Hist. 1566.

 As previously stated the Committee reported the Elliot Bill favorably. When the committee approved Bill was considered by the House it was amended by substituting the Landrum-Griffin Bill *in toto* for the provisions of the committee approved Elliot Bill. II Leg.Hist. 1691. S. 1555 was then amended by substituting the Landrum-Griffin provisions (now number H.R. 8342 however) for its provisions. II Leg.Hist. 1701. S. 1555, as thereby amended, was then passed by the House. II Leg.Hist. 1702. It went to a conference where § 501 survived unchanged and ultimately became § 501 of the Labor-Management Reporting and Disclosure Act of 1959.

From this outline it can be seen that consideration of the remarks of Senators McClellan and Ervin in regard to § 501 of S. 1555 would tell us nothing about the legislative history of § 501 as finally passed without further reference to the legislative history of the Elliot Bill which was incorporated in the Landrum-Griffin Bill and which became the law. The quoted material shows that the Elliot Bill strongly favored the broad scope application of the fiduciary provisions of § 501(a) and not the narrow provisions referred to in the remarks of Senators McClellan and Ervin.

Based on the history outlined above it appears clear that Gurton v. Arons, based as it was on the legislative history of the Kennedy-Ervin Bill which was amended out of existence, was unduly restrictive of the scope of the fiduciary duties of union officials commanded by § 501, and that Johnson v. Nelson, basing its decision on the legislative history of the Elliot Bill, was properly decided.

The Third Circuit has recently adopted the broad scope interpretation of § 501. The United States District Court for the Western District of Pennsylvania had dismissed an action brought under § 501 on the ground that the remedy was available only in actions dealing with money or property of a labor or-

ganization, citing *Gurton* and its progeny. Antal v. Budzanoski, 320 F.Supp. 161, 164 (W.D.Pa.1970). On appeal the court first found that the complaint did state a cause of action dealing with the holding and expenditure of union funds and further, citing with approval Johnson v. Nelson, the court disagreed with the district court's "reading" of § 501. Sabolsky v. Budzanoski, 457 F.2d 1245, 1250–1251 (3d Cir.), cert. denied, 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96 (1972).

The District of Columbia Circuit has recognized that it, at least impliedly, has adopted the broad scope view of § 501, Cefalo v. Moffett, 146 U.S.App.D.C. 117, 449 F.2d 1193, 1198 n. 15 (1971), "[by] approv[ing] payment of counsel fees [in Bakery & Confectionary Workers Int. Union v. Ratner, 118 U.S.App.D.C. 269, 335 F.2d 691 (1964)] to an attorney who had successfully represented union members in a § 501 suit which sought relief for violations not involving property rights."

Appellants have not advanced any substantial arguments which would cause us to change our position with regard to the scope of § 501(a) and we decline to do so. In fact our re-examination of Nelson v. Johnson convinces us that the broader view of fiduciaries' responsibilities is correct, based on Congressional intent and the explicit language of § 501(a).

■■■ Appellants raise a second issue with regard to § 501. They argue that it gives jurisdiction for suits only for relief for the benefit of the labor organization.[8] Appellants allege that this action falls outside the statute as it seeks relief for the individual members rather than relief for the benefit of the labor organization.

This position was adopted by the Ninth Circuit in Phillips v. Osborne, 403 F.2d 826, 832 (9th Cir. 1968). In *Phillips* the officers of Local 580, International Brotherhood of Pulp, Sulphite & Paper Mill Workers, AFL–CIO, fearing that the members of the local would soon disaffiliate the local from the International Brotherhood and associate with the Western Pulp & Paper Workers, a newly formed, rival labor organization, placed the assets of the local in an escrow account under the control of the International Brotherhood and beyond the reach of the local union. The next day the members sought to have the assets returned to the local but the officers refused. The membership then voted to disaffiliate and join the Western group. Plaintiff Phillips was the president under the new organization. Defendants were the former officers of the local who had transferred the assets. The relief requested was a pro rata distribution of the transferred assets to the members of Local 580 at the time of the disaffiliation. The court held that such relief was "not for the benefit of the labor organization."

We need not decide whether *Phillips* was correctly decided as the instant case is easily distinguishable as to the relief requested of the court. The restoration of orderly democratic processes to the local union is clearly a benefit to the labor organization, and a proper subject of concern to the entire membership. Bakery & Confectionary Workers Int. Union v. Ratner, 118 U.S.App.D.C. 269, 335 F.2d 691, 696 (1964); Retail Clerks Union Local 648 v. Retail Clerks Int. Ass'n, 299 F.Supp. 1012, 1022 (D.C.D.C. 1969). In Johnson v. Nelson the relief sought was a payment of fees owing to attorneys but the enforcement of such relief, as the enforcement of the mandate issued by the membership to its officers and disregarded in violation of their fiduciary duties, was clearly of benefit to the membership. Here the

---

8. Section 501(b) reads in pertinent part:
 "When any officer, agent, shop steward, or representative of any labor organization is alleged to have violated the duties declared in subsection (a) of this section . . . [a] member may sue such officer . . . to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization."

correction of the past violations of the rights of the members and the breaches of the fiduciary obligations by both the local and International officers will be a benefit to the Local even though the relief must necessarily include the restoration of the funds withheld as a result of the defendants' wrongful acts.

 The final point raised by appellants, that some members of Local No. 3 might have a vested right in the pension fund which cannot be destroyed since they are not parties to the suit, is without merit. Appellants have not shown that any such person exists although they were in a position to do so if they wished. Further, this objection cannot be used to thwart correction of past abuses of trust. If such a situation does arise, the defendants conceivably are responsible therefor however, the legal effects of a vested interest situation, if any, must await future resolution.

Judgment affirmed.