**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Fred FERRARA and Arthur Russell,**
**Defendants-Appellants.**

**No. 965, Docket 71–1069.**

United States Court of Appeals,
Second Circuit.

Argued July 12, 1971.

Decided Nov. 5, 1971.

Harold Baer, Jr., Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., Richard BenVeniste, W. Cullen McDonald and Jack Kaplan, Asst. U. S. Attys., of counsel), for plaintiff-appellee.

Mozart G. Ratner, Washington, D. C. (Bernard Ries and George Kaufmann, Washington, D. C., on the brief), for defendants-appellants.

Before FRIENDLY, Chief Judge, and LUMBARD and OAKES, Circuit Judges.

OAKES, Circuit Judge:

Fred Ferrara and Arthur Russell appeal from convictions, after trial before Harold R. Tyler, Jr., Judge, and a jury, on nine counts of a fourteen count indictment charging violations of the "Landrum-Griffin Act," officially called the Labor-Management Reporting and Disclosure Act of 1959.[1] During the period covered by the indictment, Messrs. Ferrara and Russell were president and secretary-treasurer, respectively, of Local 11, Chain Service Restaurant, Luncheonette and Soda Fountain Employees and Bartenders Union (AFL–CIO), hereafter Local 11 or the Union.

The counts on which each of the appellants was convicted charged them as follows: One, with causing Local 11 to make a loan in excess of $2,000 for the benefit of James Gleason, a third officer of the Union, contrary to 29 U.S.C. § 503 (a); Two, with failing to report the Gleason loan in Local 11's Annual Report, in violation of 29 U.S.C. §§ 431(b) and 439(b), (d); Four, Eight and Nine, with causing Local 11 to spend money for leasing several autos for the period 1964–67 (Count Four), for gas and oil used exclusively by appellant Ferrara (Count Nine), and for payments to the Freeport Tuna Club (Count Eight), all contrary to 29 U.S.C. § 501 (c) (embezzlement and conversion); and Eleven to Fourteen inclusive with failure properly to report as disbursements to Union officers the amounts referred to in Counts Four, Eight and Nine, as well as additional sums, in reports filed in each of the years 1965–68 for the preceding year, contrary to 29 U.S.C. §§ 431(b) and 439(b), (d).

Acquittals were had on four counts— charging conversion of Union funds by improper expenditures—Counts Five (meals), Six (prescription drugs), Seven (tobacco) and Ten (liquor), and on Count Three charging appellant Russell with failure to maintain certain required records.

As appellants' arguments are many, and vary from count to count, we will refer to them separately.

Counts One and Two relate to the Gleason loan, one made to a Local 11 business agent from the Officers' Retirement Fund in the amount of $3,000 on or about September 23, 1965. Taking the evidence in the light most favorable to the Government, United States v. Kahaner, 317 F.2d 459 (2d Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L. Ed.2d 65 (1963), appellants, longtime chief officials of Local 11, knew that Union funds in excess of $2,000 could not be directly loaned to Gleason, since he was an "officer or employee" of the Local within the direct prohibition of 29 U.S.C. § 503(a). That they knew this is established by the testimony of the Union's attorney, who testified that he also advised them that "the union was a labor organization as defined by the Landrum-Griffin Act," but that it would be proper to make a loan from the "Officer's Pension Fund of Local 11," a retirement plan trust sometimes referred to in the record as the "Officers' Retirement Fund" or "Retirement Plan" (referred to hereafter as Retirement Fund or Fund).

A loan was made indirectly to Gleason by Ferrara and Russell from money in the Retirement Fund. A $3,000 check on the Fund, payable to Gleason, was voided and a subsequent check was drawn by Russell, payable to William Schamber, a Walgreen Drug Company food and fountain manager and member of Local 11's executive board from 1956 to 1967. Schamber endorsed the check and gave the Local security in the form of a statement that, after a stated date, 80 per cent of his (Schamber's) salary could be deducted until the loan was repaid. Appellants concededly knew that the loan was going to Gleason, knowledge that would make the loan improper if it were an indirect loan by the Union under 29 U.S.C. § 503(a). We thus need not determine whether the loan was

1. 29 U.S.C. § 501 et seq.

made through Schamber as a conduit because, on the one hand, as the Government argues and as Gleason testified, appellant Ferrara told Gleason that the Local's attorney thought it was "illegal for anybody to take a loan," but not illegal for a manager like Schamber to receive it, or because, on the other hand, as appellants contend, Gleason was not financially responsible and Schamber was.[2]

Was the Retirement Fund here an instrumentality of the Union, however, so as to justify treatment of the loan as a matter of law—as it was treated by the court below—as an "indirect" loan made by the Union? It is plain that, generally speaking, retirement plan trusts are not included in the definition of a labor organization in § 3(i) of the Act, 29 U.S. C. § 402(i).[3] Rather, they generally fit within the definition of a "trust in which a labor organization is interested," as separately set forth in the Welfare and Pension Plans Disclosure Act, § 3(1), 29 U.S.C. § 402(1). The Government points out that the Union created the Retirement Fund and could abolish it, that there were no outside or independent trustees, and that no one but a Union officer or employee could benefit from the Fund. The Government also suggests that after the first year all the money deposited in the Fund account came from the general moneys of the Union and claims—although this is doubtful[4]—that in the event of termination, all sums over and above those vested in the beneficiaries are to revert to the Union. The appellants argue, as they did to the court below, that the Re-

---

2. Weighing against Gleason's testimony and the Government's point is that Schamber was also apparently an officer of the Union within the prohibition of the Landrum-Griffin Act; although not full-time or paid, as a member of the executive board he would seem to be an "officer" both within the Local 11 By-Laws and the Act, and if he were an officer a loan to him would be just as illegal as a loan to Gleason. Weighing against appellants' contention, however, is the fact that by the use of a friendly officer at the Union's bank, Gleason was never required to endorse the check.

3. "Labor organization" means a labor organization engaged in an industry affecting commerce and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization, other than a State or local central body.

29 U.S.C. § 402(i).

4. The Trust under the Plan provides:
Article IX: Duration and Termination of the Trust
Section 1) Unless sooner terminated, the Pension Fund herein established shall be irrevocable and shall continue indefinitely, provided, however, that the membership of the Union, after written notice and at a special meeting duly called for that purpose only, may revoke and terminate this trust upon six (6) months [sic] written notice to the trustees at the office of the Pension Fund, and the trust hereinabove established shall be deemed terminated at the expiration of such period and all funds, securities, notes, valuables and properties in the possession of the trustees and held by them under this Declaration of Trust shall be turned over to such agency as may be determined and designated by the Union. No such termination, however, shall be effectuated unless at the time of such termination a fully funded pension is provided for each officer who is then entitled to a pension * * *.

The Plan itself provides:

4.2 *Irrevocability of Contributions*— Any and all contributions made by the Union shall be irrevocable and shall be transferred to the Trustees and held as provided in this Plan and the Trust Agreement to be used in accordance with the provisions of this Plan in providing the benefits and paying the expenses of the Plan, and neither such contributions nor any income therefrom shall be used for or diverted to purposes other than for the exclusive benefit of, or on account of Members, and payment of administration expenses of the Plan.

tirement Fund was separately approved by the Internal Revenue Service (although it affects fewer than 25 employees),[5] that there was no commingling of Retirement Fund money with Union money, and that in the event of termination the interests of the participating members "fully vest. * * *." [6] Thus, appellants' argument runs, the Fund was a separate and independent entity.

Whether the Government's or the appellants' thesis is correct was never submitted as an issue to the jury, the trial court assuming that the sums in the Retirement Fund consisted of Union money. To be sure, the trial court did give appellants the benefit of a charge with respect to intent, based upon the Union attorney's alleged advice, but the question whether the Retirement Fund money was really the Union's was not submitted.

The trial court reasoned, and the Government argues, that, if the Fund were not treated as Union money for the purposes of 29 U.S.C. § 503(a), the Landrum-Griffin Act would have a hole in it "so big that a fleet of abuses [sic] can go in through it abreast." But we cannot rewrite the statute for Congress.

■ This is a criminal statute we are construing, and we have been admonished not to "enlarge the reach of enacted crimes by constituting them from anything less than the incriminating components contemplated by the words used in the statute." Morissette v. United States, 342 U.S. 246, 263, 72 S.Ct. 240, 250, 96 L.Ed. 288 (1952). There is separate legislation controlling welfare and pension benefit plans and requiring disclosure of loans made from such plans.[7] Here a jury might find the Fund to be a bona fide separate and distinct entity and not one established to evade legal prohibitions against certain disbursements of union funds, or it might find, to the contrary, that the fund was an instrumentality of the Union, as occurred in United States v. Pipefitters Local Union 562, 434 F.2d 1116, 1121 (8th Cir. 1970), cert. granted, 402 U.S. 994, 91 S.Ct. 2168, 29 L.Ed.2d 160 (1971). See also United States v. Roth, 333 F.2d 450, 453 (2d Cir. 1964) (2–1 decision), cert. denied, 380 U.S. 942, 85 S.Ct. 1020, 13 L.Ed.2d 961 (1965). This is not necessarily to hold, as did Bryan v. United States, 373 F.2d 403 (5th Cir. 1967), and United States v. England, 347 F.2d 425 (7th Cir. 1965), that even undisputed facts must be submitted to the jury. Rather, the record before us does not permit us to rule as a matter of law with either party. Without a jury finding on the question whether the loan from the Retirement Fund was "indirectly" from the Union, we are required to reverse on Count One, which carries Count Two with it,[8] and remand for a retrial with appropriate instructions.

■ We sustain the convictions on Counts Four, Eight and Nine, however, the counts charging unlawful expenditures of Union funds, and on Counts Eleven to Fourteen inclusive, charging failure to report those expenditures.

Count Four charged appellants with unlawfully causing Local 11 to spend over $33,000 in 1964–67 for long-term auto leasing; Count Nine charged appellants with causing the Local to spend over $1,600 for appellant Ferrara's gas and oil expenditures. The principal defense—that the auto leases and gas expenditures were a necessary adjunct to Union organizing activities—was pre-

---

5. Int.Rev.Code of 1954, § 401(a) (3).

6. Section 11.2, added by undated Amendment, approved apparently by I.R.S.

7. Welfare and Pension Plans Disclosure Act, § 7(f) (1) (D), 29 U.S.C. § 306(f) (1) (D). Plans covering under 25 employees are exempt from the W.P.P.D.A.

under 29 U.S.C. § 303(b) (4), and here there may be a question whether the officers' Retirement Fund was absorbed into and may be treated as one with a larger, if later, employees' plan of Local 11.

8. Since Count Two is for failure to report the loan as one from Local 11, it stands or falls with the loan charge in Count One.

sented to the jury and rejected by it under appropriate instructions. By its verdict of guilty the jury found that appellants, without authority and for personal purposes, entered into long-term auto leases for themselves and their Union friends. The defense that Local 11's executive board had authorized the lease, which would not prevail if the Union were dominated as this one may have been, United States v. Silverman, 430 F. 2d 106, 123 (2d Cir. 1970), cert. denied, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971); see United States v. Dibrizzi, 393 F.2d 642, 645 (2d Cir. 1968), was also disbelieved by the jury in light of the testimony of four executive board members that such leasing was never discussed, let alone authorized. Such disbelief was doubtless furthered by the Government's proof of the spuriousness of unsigned minutes of an executive board meeting of May 23, 1960, purporting to authorize rental of cars for the president (Ferrara) and secretary-treasurer (Russell) (and the purchase of gas and oil for them). This proof consisted of showing that the typewriter ribbon used to type the purported minutes was not on the market until a year after the date borne by the document. Cf. United States v. Silverman, *supra,* 430 F.2d at 118.

Count Eight charged $325 of unlawful Union expenditures at the Freeport Tuna Club, of which appellant Russell was an officer and where he kept a 35-foot boat. The first defense to this charge was that the dinners were for Union business, but there was evidence that they were merely social occasions. Appellant Russell's testimony that the Tuna Club was a "charitable" as opposed to a profit-making organization probably was not meant to suggest, as the Government argues, that the payments to the Tuna Club were charitable contributions; at least we view the testimony charitably. But plainly the jury was justified in finding that these were unauthorized expenditures for personal benefit—the relationship of Local 11 business to a Tuna Club's dinners is too tenuous to warrant further discussion.

Finally, the convictions on Counts Eleven through Fourteen, charging failure to include the converted sums as officer disbursements in the Local 11 Annual Reports, must be sustained. The auto, gas and oil and Tuna Club disbursements were squarely in the category of "disbursements to officers" (a heading in the Local's Annual Reports), to be reported as such [9] rather than reported, as they were, under some other general heading such as "Disbursements—For Other Purposes" or "Office and Administrative Expense." United States v. Silverman, *supra,* 430 F.2d at 116; United States v. McCarthy, 422 F. 2d 160, 163 (2d Cir.), appeal dismissed, 398 U.S. 946, 90 S.Ct. 1864, 26 L.Ed.2d 286 (1970). The only portion of the charge on these counts objected to below was the failure to charge that an accountant's advice negatived criminal intent, but the court's charge adequately covered the issues of intent and reliance upon the accountant's advice.[10] *See*

---

9. 29 U.S.C. § 431(b) provides:
   Every labor organization shall file annually with the Secretary a financial report signed by its president and treasurer or corresponding principal officers containing the following information in such detail, as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year—
   
   \*    \*    \*    \*    \*
   
   (3) salary, allowances, and other direct or indirect disbursements (including reimbursed expenses) to each officer
   \*  \*  \*.

10. The judge charged:
    In order to find the defendants Russell and Ferrara guilty of these counts, 11 through 14, you must find established beyond a reasonable doubt the following essential elements:
    1. That either defendant or both were required to file annual reports on behalf of Local 11. No doubt about that. The law requires them to do that.
    2. That he, in fact, filed and signed the report or reports in question for the periods as alleged.

United States v. Diamond, 430 F.2d 688, 694–695 (5th Cir. 1970); Bisno v. United States, 299 F.2d 711, 720 (9th Cir.), cert. denied, 370 U.S. 952, 82 S.Ct. 1602, 8 L.Ed.2d 818 (1962).

It is unnecessary to deal in detail with appellants' claims of improper evidentiary rulings. The only one warranting discussion relates to the court's restrictions on cross-examination of James Gleason, the Government's chief witness on the loan counts. Appellants sought to question Gleason concerning the substance of charges previously brought against him within the Union, apparently intending to attack Gleason's credibility on the basis of his hostility toward the Union. The Government objected to this line of inquiry, on the basis that the Union's action against Gleason had been declared null and void in a civil suit, as in violation of § 101(a) (5) of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 411(a) (5), brought against the Union by Gleason. Gleason v. Hotel Employees Local 11, 300 F.Supp. 1241, 1255 (S.D.N.Y. 1969), aff'd 422 F.2d 342 (2d Cir. 1970). Judge Tyler concluded that to allow questioning of Gleason about the Union charges, in light of the prior ruling in the civil action, would be "grossly unfair on credibility or any other grounds * * *."

█ Appellants were able to elicit testimony that Gleason was dismissed, that his Union salary was terminated, and that the Union had brought nine charges against him, all of which went to the question of his hostility toward

the Union and its officers. In light of the admission of such relevant credibility testimony, we cannot say that the trial judge, exercising the discretion granted him on evidentiary rulings, United States v. Owens, 263 F.2d 720 (2d Cir. 1959), committed prejudicial error by disallowing interrogation regarding the specific charges made in null and void Union proceedings.

More important is the contention that reversal on the other counts is required because of a prejudicial "spill over" of the evidence relating to the loan. *Cf.* Benton v. Maryland, 395 U.S. 784, 797–798, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *see* Wright, Federal Practice and Procedure: Criminal § 527 (1969). We have carefully examined this record and find no such prejudice here. The court's instructions carefully explored each charge, and the jury was obviously selective, acquitting appellants on four of the conversion counts and acquitting appellant Russell on the count charging him with failure to keep certain records. Moreover, the subject matter of the counts for conversion and failure to report was unrelated to the counts concerning the Gleason loan. Accordingly, we affirm the convictions on all counts except One and Two. *See* United States v. Adcock, 447 F.2d 1337 (2d Cir. Aug. 16, 1971); United States v. Febre, 425 F.2d 107, 113 (2d Cir.), cert. denied, 400 U.S. 849, 91 S.Ct. 40, 27 L.Ed.2d 87 (1970); United States ex rel. Weems v. Follette, 414 F.2d 417, 420 (2d Cir. 1969), cert. denied, 397 U.S. 950, 90 S. Ct. 973, 25 L.Ed.2d 131 (1970).

---

3. That the defendant in question made false statements in these reports knowing them to be false.
And last:
4. That the false statements, if such in fact they were, were false statements of material facts.
Further, he instructed the jury that:
[Y]ou will notice that in respect to counts 11 through 14 all that is required is proof that the defendants knew that they were falsely misstating or failing to report material facts in the so-called LM2 reports. In other words, the burden of knowledge here is just about that.

All you have to be satisfied of is that Ferrara or Russell, or both of them, knew that they were required to report this information and that they failed to do so.
Now, of course, as you know, the defendants say they didn't know they were required to do that, because they had reported the legitimate union expenses and that was that, and that these items were no more than that, and that they didn't overlook it, and that their accountants and lawyers approved it, and that was that.

■ Ordering repayment of portions of the unauthorized personal expenditures ($17,000 by appellant Ferrara and $5,000 by appellant Russell) was proper. United States v. Berger, 145 F.2d 888 (2d Cir. 1944), cert. denied, 324 U.S. 848, 65 S.Ct. 685, 89 L.Ed. 1408 (1945); *cf.* United States v. Caiello, 420 F.2d 471, 476 (2d Cir. 1969), cert. denied, 397 U.S. 1039, 90 S.Ct. 1358, 25 L.Ed.2d 650 (1970). By limiting the amounts to be repaid to sums substantially lower than the total expenditures made, the trial judge here avoided the problem of determining independently the "exact amount" to be reimbursed to the Union, United States v. Stoehr, 196 F.2d 276, 284 (3rd Cir.), cert. denied, 344 U.S. 826, 73 S.Ct. 28, 97 L.Ed. 643 (1952), a problem which might otherwise require a remand. *See* Karrell v. United States, 181 F.2d 981 (9th Cir.), cert. denied, 340 U.S. 891, 71 S.Ct. 206, 95 L.Ed. 646 (1950).

Judgment of conviction on Counts One and Two reversed and remanded; judgment of conviction on Counts Four, Eight, Nine, Eleven, Twelve, Thirteen and Fourteen affirmed.