UNITED STATES of America,
Appellee,

v.

Alleyne F. ROBINSON et al.,
Defendants-Appellants.

Nos. 686, 698, 703, Docket 74–2483,
74–2492 and 74–2541.

United States Court of Appeals,
Second Circuit.

Argued Feb. 20, 1975.

Decided March 17, 1975.

T. Barry Kingham, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty. for the Southern District of New York, Lawrence S. Feld, Asst. U. S. Atty., of counsel), for appellee.

Manuel Taxel, New York City (Louis Noah Forman, New York City), for defendant-appellant Alvarez.

Phylis Skloot Bamberger, New York City (The Legal Aid Society, New York City), for defendant-appellant Villegas.

Samuel Zuckerman, New York City, for defendant-appellant Robinson.

Before ANDERSON, MULLIGAN and VAN GRAAFEILAND, Circuit Judges.

MULLIGAN, Circuit Judge:

These are appeals by Alleyne F. Robinson, Jose Antonio Acosta Alvarez and Joseph M. Villegas from judgments of conviction entered on November 7, 1974 in the United States District Court for the Southern District of New York after

a two-week jury trial before Hon. Dudley B. Bonsal, United States District Judge. The indictment in various counts charged the three defendants with a conspiracy to violate, as well as substantive violations of, 29 U.S.C. § 501(c) by the conversion of the property of the National Maritime Union (NMU), where Robinson served as an official and his co-defendants as employees. The defendants were convicted on all counts on which they were tried. Robinson received a one-year suspended sentence, was placed on probation for one year and fined a total of $1000 to be paid during the year of probation. Alvarez and Villegas were sentenced to probation for three months and a fine of $250 to be paid within that time.

I

The NMU is a labor organization representing unlicensed seamen on commercial and Government vessels, including those operated by the Government's Military Sea Transportation Service (MSTS). The NMU divided seamen into groups for the purpose of allocating work. In 1968–70, only full-fledged members of the NMU were classified in Group I. Seamen who were in three lower groups could compete for jobs on a priority basis only after Group I seamen had been offered the opportunity. To qualify for Group I status a seaman had to have served at least 800 days at sea on NMU vessels within a five-year period. To establish eligibility for Group I status certain forms had to be completed by the applicant. If he had served on commercial vessels, he would complete a "white form" and furnish copies of "discharges" received at the end of a voyage to support his claim of time at sea. This information then had to be verified by the NMU staff at headquarters, where records were kept of Pension and Welfare Fund contributions by commercial employers; these contributions were computed according to the amount of each NMU member's seatime. If the

seaman claimed MSTS service, he would complete a "green form" detailing his time at sea on MSTS vessels, which the union could verify by checking MSTS personnel files in Brooklyn. Upon verification a Group I union book and "blue card" would be issued and the seaman would pay a $150 initiation fee and $30 for quarterly dues thereafter.

Robinson, who was an elected official of the Union, acted as a liaison between the seamen aboard vessels in port and the shore-based union offices. He also maintained an office in the NMU hall in New York City, where his particular responsibility was to handle the processing of applications for seamen who claimed MSTS experience.

On trial, the Government produced nine seamen who had applied to Robinson for Group I status although they admittedly lacked the necessary experience at sea. Five of the seamen were introduced to Robinson by Villegas and Alvarez, who were respectively a Patrolman and a Master-at-Arms of the NMU. Villegas and Alvarez charged the seamen fees ranging from $500 to $750 to get Group I classification.[1] The Government's proof established that, in the case of six seamen who had executed the green (MSTS service) forms, when the forms were returned by Robinson they contained entries of sea service which were false and had not been given to Robinson. All of the forms when returned to the NMU from the Brooklyn MSTS office bore the signature of E. U. Maynard in the space for verification by the personnel office of MSTS. Although Mrs. Maynard did not appear as a witness, the Government's theory was that she, as one of the two clerks in the MSTS office, was acting in concert with Robinson to verify falsely the forms which noted sea service which had never taken place.

On appeal, Alvarez and Villegas challenge, *inter alia,* the sufficiency of the evidence on both the substantive and

---

1. These five seamen paid fees to Alvarez or Villegas prior to meeting with Robinson. Other seamen paid various amounts, up to $850, to Robinson or unknown co-conspirators when the application forms were signed.

conspiracy counts. In view of the evidence of illicit payments by seamen to each man and their presence when these seamen executed forms in blank in order to procure Group I status, the claim that the evidence was insufficient is of no substance. Several other points raised by the appellants are frivolous.

## II

The only argument raised on appeal which merits discussion is the position taken by all the appellants that the conduct which was the basis for the indictment and conviction here does not constitute a crime under 29 U.S.C. § 501(c). At the end of the trial, all defense counsel renewed their motions to dismiss on this ground, and Judge Bonsal denied the motions in a memorandum dated November 7, 1974.

Section 501(c) of the Labor-Management Reporting and Disclosure Act of 1959 provides:

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

The theory of the Government is that the defendants conspired to convert, and that Robinson, aided and abetted by Alvarez and Villegas, did in fact convert to their own use and personal profit, the Group I application forms which were NMU property. The contention of the defendants was and is that the forms which were converted had no value and that the NMU actually profited from the activity of the defendants, who enriched the treasury of the NMU by adding new paying members. The argument continues that the legislative history of the statute demonstrates that, although broad fiduciary responsibilities for union officials were established in section 501(a)[2] of the statute, the criminal conversion and embezzlement subdivision, section 501(c), was not given a similarly broad scope. It is urged that, while the conduct involved here may constitute a violation of the fiduciary obligations of the defendants, the remedy is properly a civil action by the union or its employees under section 501(b),[3] which implements 501(a), but not a criminal proceeding under 501(c).

There is no question but that the legislative history of the statute reveals that

**2.** Section 501(a) provides in pertinent part as follows:

The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization.

**3.** Section 501(b) provides in pertinent part as follows:

When any officer, agent, shop steward, or representative of any labor organization is alleged to have violated the duties declared in subsection (a) of this section and the labor organization or its governing board or officers refuse or fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization, such member may sue such officer, agent, shop steward, or representative in any district court of the United States or in any State court of competent jurisdiction to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization.

the Congress was principally concerned with the looting of union treasuries by union leaders for their personal profit.[4] It is understandable that this kind of obvious abuse by union officials was the principal concern of congressional leaders in the hearings and debates which preceded the enactment of the statute in question. However, it is evident from the clear and unambiguous language employed by the statute that the behavior condemned is not limited to the embezzlement or conversion of union funds. The statutory language condemns the embezzlement or conversion not only of moneys, funds and securities, but also of "property, or other assets of a labor organization . . . directly or indirectly . . . ."

■ It cannot be disputed that the green and white forms here were converted by the defendants and that they constituted union property. The argument that there was no violation of the statute because the forms had no intrinsic value is not persuasive. In the first place, the statute does not require that the property be of any particular value. The forms obviously were not taken to be used as scrap paper or to make paper hats. When, through the connivance of the defendants, the forms were filled in with false information, their value to the unqualified seamen was great enough to persuade them to pay $500 to $850 to the defendants to receive an NMU union book and blue card.[5]

■ The contention that there was no statutory violation since the NMU lost nothing and in fact benefited by the transaction to the extent that it obtained the dues of new members is not convincing. The new members were spurious and presumably the privileges of Group I membership are dependent upon meaningful experiential norms which have been established in good faith by the union. The erosion of these standards

---

**4.** For example, Senator McClellan, Chairman of the Senate Select Committee on Improper Activities in the Labor-Management Field, and Senator Curtis discussed on the floor of the Senate the union corruption at which the legislation was aimed:

> Mr. McClellan. That is correct. In the select committee we found many instances of violations of that trust. Probably the most flagrant instance was the Beck situation. Instead of assuming his responsibility and the obligation to handle union money as if it belonged to the union, he simply handled it for his own personal profit and gain. In other words, he pilfered nearly $400,000 of union funds, as we discovered.
>
> .    .    .    .    .
>
> Mr. Curtis. We uncovered a number of instances wherein union funds and profits were handled by corrupt officers, just as though they had a proprietary interest in the money.
>
> Mr. McClellan. Yes.
>
> Mr. Curtis. That situation obtained in some of the Johnny Dio unions in New York. It also was true of the operating engineers in San Francisco. In a number of cases individuals handled union money without regard to who owned the money.
>
> Mr. McClellan. Yes. I may remind my distinguished colleague—and I say this for the information of all Senators—that the Teamsters' Union in St. Louis was bought out and paid off. The officers were, in effect, bought out and the union was

> turned over to the person who is there now, Gibbons. How was that money obtained? The retirement pay money was used.
>
> Mr. Curtis. Or severance pay.
>
> Mr. McClellan. Yes. The retirment or severance pay money was given to the officers who were bought out.
>
> I do not think the union members, the working people, pay their dues in the unions for that sort of manipulation. If we establish a fiduciary responsibility under the law, I do not think union officers could perpetrate such acts.

**5.** This situation is analogous to the stealing of blank checks, belonging to the United States, with an intrinsic value of a total of six cents, which was held to violate a statute making it a crime to steal "any kind or description of property belonging to the United States." Keller v. United States, 168 F. 697 (7th Cir. 1909) (*per curiam*). The intrinsic value of the converted forms in this case is similarly very small and the statute violated is similarly broad, prohibiting the conversion of "any of the . . . property . . . of a labor organization . . . ." See also Lotto v. United States, 157 F.2d 623, 629 (8th Cir. 1946), cert. denied, 330 U.S. 811, 67 S.Ct. 1082, 91 L.Ed. 1266 (1947); Donegan v. United States, 287 F. 641, 646 (2d Cir. 1922), cert. denied, 260 U.S. 751, 43 S.Ct. 251, 67 L.Ed. 495 (1923); Clark v. United States, 268 F. 329, 331 (6th Cir. 1920).

by the meretricious machinations of the defendant officials and employees constituted a breach of trust which cannot possibly be characterized as a benefit to the union. The only beneficiaries were the defendants who were selling fraudulent union credentials. The fact that union funds were not depleted does not remove the case from the reach of the statute. One of the aims of the criminal provision here involved was to preclude the unjust enrichment of union officials and agents, which was precisely what occurred here. The allocation of jobs by priority is certainly a principal benefit of union membership and, insofar as the process was thwarted and frustrated by the scheme employed here, the union and its bona fide members suffered a loss which, although not readily calibrated in terms of dollars, is nonetheless real. The statute here does not attempt to draw common law distinctions between grand and petit larceny, as it well could have,[6] but is addressed to defendants who embezzle, steal or unlawfully and willfully abstract or convert *any* of the property of a labor organization. Such conduct was engaged in by the defendants in this case.

Although appellants claim that this is a case of first impression, that is true only to the extent that the fact pattern is unusual. However, this court has had the obligation to construe section 501(c) on previous occasions.[7] In United States v. Silverman, 430 F.2d 106 (1970), cert. denied, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971), Judge Friendly pointed out that in section 501(c), as in other comparable criminal provisions, the Congress has

> gone beyond the common law offense of larceny and the old statutory crime of embezzlement because "gaps or crevices have separated particular crimes of this general class and guilty men have escaped through the breaches," Morissette v. United States, 342 U.S. 246, 271–272, 72 S.Ct. 240, 254, 96 L.Ed. 288 (1952). But, as was there held, despite minor variations in language the common thread is that the defendant, at some stage of the game, has taken another person's *property* or caused it to be taken, knowing that the other person would not have wanted that to be done.

430 F.2d at 126–27 (emphasis added).

The Court in *Silverman* also essentially defined the unlawful and willful conversion of union property:

> It is easy to understand how a union employee does this when he "unlawfully and willfully" uses union funds in a manner that works to the personal benefit of himself or the payee and does not benefit the union, whether or not the union went through the form of authorization; the "union" presumably would have objected if it had been able to speak freely.

430 F.2d at 127. See also United States v. Ottley, 509 F.2d 667 (2d Cir., 1975).

In our view, the activities of the defendants here fall within Judge Friendly's description of the crime Congress intended to establish. They utilized the property of the union in a way which benefited themselves and not the union.

---

6. See, e. g., 18 U.S.C. §§ 641, 643, 644 & 648; N.Y.Penal Law §§ 155.25 to 155.35.

7. Most of the litigation in this circuit arising under the statute has concerned alleged violations of section 501(a) and relief has been sought under section 501(b). We have consistently given a relatively narrow interpretation to these provisions, refusing to intervene in matters which we have considered to involve simply the internal operations of a union. Head v. Brotherhood of Railway Clerks, 512 F.2d 398 (1975); Coleman v. Brotherhood of Railway Clerks, 340 F.2d 206 (1965); Gurton v. Arons, 339 F.2d 371 (1964).

We have, however, made it clear that those sections do apply "to fiduciary responsibility with respect to the money and property of the union . . . ." Gurton v. Arons, *supra*, 339 F.2d at 375. To the same effect, Head v. Brotherhood of Railway Clerks, *supra*, 512 F.2d at 398 n. 3. Other circuits have given a broader reading to section 501(b). E. g., Pignotti v. Local # 3, Sheet Metal Int'l Ass'n, 477 F.2d 825 (8th Cir.), cert. denied, 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973); Sabolsky v. Budzanoski, 457 F.2d 1245 (3d Cir.), cert. denied, 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96 (1972).

Their action was not authorized and presumably the NMU and its membership would have objected had it been made known. The judgments must therefore be affirmed.

Affirmed.