UNITED STATES of America, Appellee,

v.

**Michael CAPANEGRO,
Defendant-Appellant.**

**No. 729, Docket 77–1425.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 21, 1978.

Decided May 15, 1978.

---

Don D. Buchwald, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, Pamela R. Chepiga, Richard Weinberg, Asst. U. S. Attys., New York City, of counsel), for appellee.

Henry Putzel, III, New York City (Donna M. Zerbo, Law Student Asst., Michael J. Capanegro, pro se, of counsel), for defendant-appellant.

Before FRIENDLY, MULLIGAN and MESKILL, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal by Michael Capanegro from a judgment of conviction entered on October 23, 1977 in the United States District Court for the Southern District of New York, after a 10 day trial before Hon. Thomas P. Griesa, United States District Judge, sitting without a jury. An indict-

ment filed on September 24, 1976 charged Capanegro with 24 counts of embezzling, abstracting and converting monies of Local 1101 (Local or Union) of the Communication Workers of America (C.W.A.) in violation of 29 U.S.C. § 501(c). On July 7, 1977 the court found the defendant guilty on 17 counts and not guilty on seven counts. Judge Griesa filed special findings of fact on July 19, 1977. On October 13, 1977 Capanegro was sentenced to concurrent terms of imprisonment of one year and a day on each count.

In early 1971 appellant represented without fee Ricky Carnivale, who was challenging the incumbent for the presidency of the Local. The campaign was successful and a Carnivale slate of officers was certified in April, 1971. From that point through December, 1972 Michael Capanegro was retained as attorney for the Union at a $25,000 annual retainer. In June, 1971 the members of the Union voted to pay the legal fees of 18 members who had been arrested for actions committed during a 13 day wildcat strike. The membership further voted to pay the legal fees of any member arrested for strike activities in the future. On July 14, 1971 the Local went on strike against the New York Telephone Company; the strike lasted until February 18, 1972. During that period about 45 Union members were arrested for strike-related crimes. Although a few were arrested for the felony of assault, the vast majority were charged with such state misdemeanors or offenses as disorderly conduct or harassment. As each arrest occurred the Local's officers either referred the member to Capanegro or advised the attorney of the incident. Capanegro then submitted legal bills to the Union for his alleged representation. These bills were paid from the Local's Defense Fund which was in part financed by the parent union C.W.A. Between October 21, 1971 and February 29, 1972, in addition to his regular fees under the Retainer Agreement, Capanegro received 45 checks totalling $113,025 from the Local's Defense Fund. Capanegro's bills for alleged legal services were sent directly to Carnivale; no copy was sent to the individual member

allegedly represented. Carnivale signed all of the checks; indeed, over $100,000 of the Defense Fund checks were actually written out by Carnivale instead of by the "check writers" of the Defense Fund Committee, the usual practice. After the strike, the extent of Capanegro's billings eventually became known to the parent union as well as the Local. An audit was conducted and Capanegro's bills were brought to the attention of the Department of Labor in 1973. As the result of a criminal investigation, this indictment followed.

I

Each of the 24 counts of the indictment related to Capanegro's billing and subsequent receipt of payment for alleged legal fees incurred while representing individual Union members. In finding Capanegro guilty on 17 counts of embezzling, stealing, willfully abstracting or converting to his own use the funds of the Union in violation of § 501(c), Judge Griesa wrote a carefully detailed 34 page opinion finding facts specially as requested by the defendant pursuant to Fed.R.Crim.P. 23(c). The opinion examined the facts and circumstances underlying each count of the indictment.

Appellant argues that the evidence failed to support the guilty verdicts. Under the familiar rubric the evidence must be viewed in the light most favorable to the Government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). In this light, or almost any other form of illumination, the appellant's argument on this point is, at best, unconvincing.

An examination of the findings below reveals that in case after case Capanegro's bills were knowingly false. Each bill purported to provide a description of the services which he had rendered a particular member of the Local. In some cases appellant submitted bills for services to members whom he never saw or consulted. At least twice Capanegro's only service was to speak on the phone and advise the member to file a complaint with the police department. Yet in both cases he billed for appearances

at hearings. On other occasions Capanegro made brief court appearances for members whose cases were adjourned in contemplation of dismissal. However, he billed for multiple court appearances including trial representation. He never prepared or filed a single brief or memorandum of law although in several cases he claimed that such services had been performed. Capanegro consistently claimed to have made appearances at police stations, at hearings, and also to have held conferences with witnesses when none of these events had actually transpired. In some cases appellant claimed to have represented members who in fact were represented by other counsel. A review of all the counts upon which Capanegro was found guilty discloses that as to each Judge Griesa found the statement of defendant's services was almost entirely a statement of services which had not been rendered. Nor were the statements good faith estimates of services to be performed. We see no purpose in further discussion of individual counts since the evidence fully established a brazen scheme of looting the Union coffers.

On appeal it is argued that the Government offered no evidence that Capanegro's bills were so outrageously high as to constitute fraud. In support of this we are told that the law is "a profession which lacks any real standards concerning the amount of money it bills its clients." The obvious answer, of course, is that an attorney under any standard cannot bill a client for services neither performed nor ever intended to be performed.

Capanegro did testify in his own behalf, generally maintaining that his bills were a good faith estimate of services rendered. Appellant now claims that Judge Griesa's acquittal of Capanegro on seven counts rendered the verdict of guilty on 17 others inconsistent, thus requiring reversal. The point is totally frivolous. Judge Griesa carefully weighed the Government's evidence with respect to each count and found that in some the Government's case did not persuade him beyond a reasonable doubt. The convictions here were amply supported, indeed, compelled by the evidence. That the trial judge saw fit to acquit appellant on seven counts attests to a careful weighing of the testimony and other evidence on each count rather than to any inconsistency.[1]

## II

The principal issue on this appeal[2] is whether Capanegro was employed by the Union within the language of § 501(c). That section provides:

*Any person* who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or *by which he is employed,* directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(Emphasis supplied).

Capanegro was clearly "employed" by the Union. The retainer agreement of June 10, 1971 provided in part:

---

1. On this point appellant relies solely on *United States v. Maybury,* 274 F.2d 899 (2d Cir. 1960) (Friendly, J.). In that case, the appellate court found a verdict of guilty on an uttering count inconsistent with an acquittal on a forgery count. The trial judge had found that the defendant had forged the check for the purpose of proving knowledge of forgery for the uttering charge; yet he acquitted the defendant on the forgery charge. Clearly, no such internal inconsistency is present here since each count referred to individual transactions between Capanegro and his client.

2. Appellant has raised several other arguments—insufficiency of the evidence, inconsistent verdict—which are discussed in the text. In addition, we do not overlook appellant's claim that the settlement of a civil suit, brought by members of the Union against him and based upon the same factual issues here litigated, constitutes a collateral estoppel against this criminal prosecution brought by the United States. The law of course is contrary. *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *United States v. Tramunti,* 500 F.2d 1334, 1346–49 (2d Cir.), cert. denied, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974).

1. The client does hereby employ and retain the attorney [Capanegro] as its attorney for and during a period commencing on the 1st day of April, 1971 and shall continue for as long as Ricky Carnivale, President, shall remain in office.

2. The attorney accepts such employment and retainer and agrees to render and perform all legal services necessary or proper for the protection of the interests and property of the client whenever and to the extent required by such client.

. . .

Carnivale or other Union officers either referred members to Capanegro for legal assistance or advised him that a member had been involved in some incident related to the strike. Appellant's fees were not paid by Union members referred to him but by his employer, the Union. In the only legal papers submitted by Capanegro to courts in his representation of the strikers, affidavits for adjournment, he described himself as "Chief Counsel to the Communications Workers of America, Local 1101." Appellant's relationship with the Union was not casual or happenstance. His affidavit indicates that he was at the Local's office "daily and working on union business." He spoke at Union gatherings. For the year 1972, 76% of his gross professional income was derived from the Union.

In sum, Capanegro by express agreement and in fact was employed by the Union. We have no difficulty therefore in holding that Capanegro was employed by the Union within the meaning of § 501(c).[3]

■ Appellant's argument to the contrary is that Capanegro was not an "employee" of the Union (i. e., he was not on the Union payroll and no usual employee deductions were taken from his fees by the

Union). Rather, he argues, as attorney he was an "independent contractor" and hence not within § 501(c). We agree that Capanegro as retained counsel of the Union was not its "employee" in the common law sense of a servant as distinguished from an independent contractor. But the statute we are construing does not limit its coverage to officers or employees of a labor organization. It specifically provides for the criminal liability of "*[A]ny person*" who loots the funds of a union "*by which he is employed*" (emphasis supplied). A labor union like any other employer may employ independent contractors as well as servants or employees. See, e. g., A.L.I., Restatement of Agency § 220 (2)(b) (1933); Black's Law Dictionary 911 (4th ed. 1968) (independent contractor); Harper, The Basis of Immunity of an Employer of an Independent Contractor, 10 Ind.L.J. 494 (1935); Morris, The Torts of an Independent Contractor, 29 Ill. L.Rev. 339, 341 (1934); Smith, Scope of the Business: The Borrowed Servant Problem, 38 Mich.L.Rev. 1222, 1246 (1940); Steffen, Independent Contractor and the Good Life, 2 U. of Chi.L.Rev. 501, 502–03 (1935).

However, the common law distinction between these classifications is irrelevant to the question in this case. The issue here is not the vicarious tort liability foisted upon a master by virtue of the unauthorized activity of his servant. Such liability is based on familiar *respondeat superior* concepts which lead to exculpation where the person employed performs the work without being subject to the control of his employer. The lawyer, like the physician, is a professional and if he is guilty of malpractice it may well be that under common law doctrine his employer will not be responsible in damages to one injured as the result of the lawyer's

---

**3.** The Government urges that if Capanegro was not employed directly by the Union he was at least "indirectly" so employed within the language of § 501(c). This argument rests upon the assumption that the words "directly or indirectly" in the statute modify the verb employed. There is some indication, however, in our prior opinion in *United States v. Robinson,* 512 F.2d 491, 494 (2d Cir. 1975), that those words modify embezzle, steal, abstract or convert. For its interpretation, the Government

relies upon a report of the Department of Labor commenting on a predecessor bill to that which eventually became § 501(c). That report indicated that the Department construed the section to apply to persons having "any direct or indirect functions in connection with the money or other property of a labor organization . . . ." 104 Cong.Rec. 1327 (Jan. 30, 1958). We need take no position on this point since in our view Capanegro was in any event directly employed by the Union.

tortious activity. Cf. Birnbaum, Physicians Counterattack: Liability of Lawyers for Instituting Unjustified Medical Malpractice Actions, 45 Fordham L.Rev. 1003, 1026 n. 126 (1977). Here we are construing a statute enacted by Congress to protect union funds against pilferage by any person it employed. Capanegro was given such employment by the Union as its Chief Counsel. This employment provided him with the opportunity, which he clearly seized, to take illicit advantage of Union funds. Whether he was an independent contractor, agent, or servant, was not the concern of Congress. This is clear from the language which Congress chose in § 501(c).

The failure of Congress to use the word "employee" in § 501(c), and its provision instead for criminal liability for any person employed by the labor organization, is of some significance. The definition of employee in 29 U.S.C. § 152(3)[4] expressly excludes independent contractors. The exclusion was added by the Taft-Hartley Act in 1947, 61 Stat. 137, in response to N.L.R.B. v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), H.Rep. No.245 on H.R. 3020, 80th Cong., 1st Sess., 18 (1947), to clarify the congressional intent that the term "employee" be understood in its common law sense as a salaried person working under direct supervision. In determining the group with which an employer must bargain on issues such as wages, hours and conditions of employment, 29 U.S.C. § 158(d), it makes sense to exclude independent contractors who depend not upon wages but a fee and who themselves decide how the work will be done. See H.Rep.No. 245, supra, at 18. On the other hand, the

purpose of the Labor-Management Reporting and Disclosure Act of 1959, of which § 501(c) is a part, is not at all served by excluding from the coverage of that section a trusted legal advisor who is able to gain access to the union funds which the Act was designed to shelter.

Thus, in setting forth in § 501(a) the fiduciary obligations of officers of a union, the statute specifies "officers, agents, shop stewards, and other representatives of a labor organization." Again in § 501(b) the same listing is provided.[5] However, in § 501(c) the statute does not refer back to "such" persons but provides for criminal liability for "any person" employed by a union. Section 501(c) does not use the term "employee" which is defined in 29 U.S.C. § 402(f), but instead refers to any "person" broadly defined in 29 U.S.C. § 402(d).

In our view, the choice of language here is sufficiently flexible to include Capanegro's employment as Chief Counsel to the Union. We have heretofore affirmed the convictions under § 501(c) of defendants who held such relatively menial positions as Patrolman and Master-at-Arms of a labor organization. United States v. Robinson, 512 F.2d 491, 492 (2d Cir. 1975). It would indeed be incongruous if the Union's Chief Counsel, who had a close relationship with the Union hierarchy and obvious access to the till, were to escape the liabilities imposed by § 501(c) because he was technically not on the Union payroll but was employed as its counsel. The clear intent of Congress, in view of the purpose of the legislation as well as the language of the statute, mandates the conclusion that Capanegro

---

4. 29 U.S.C. § 152(3) states:

The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individ-

ual employed by his parent or spouse, *or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined.*
(Emphasis supplied.)

5. Whether Capanegro would be liable in a civil suit for damages under § 501(b) as a representative of the Union is not before us.

was a person employed by the Union and thus was within the coverage of § 501(c).[6]

■ Appellant also contends that it was the congressional intent to limit the reach of § 501(c) to insiders. This narrow target class, it is suggested, includes only "corrupt officers and employees, persons who—like any potential embezzlers—had inherent access to the funds and assets of a labor organization and authority to misappropriate them." The appellant argues that he had no authority since he had to submit his bills for approval to the Union.

Aside from the dubious factual postulate that Capanegro was not an insider in a rather choice position to loot the Union's funds, the legal argument is devoid of merit. Section 501(c) is not limited to the common law crime of embezzlement, which involves a misappropriation by one entrusted with funds. Indeed, the section, by its very terms, includes other forms of theft, stealing and converting. *United States v. Silverman,* 430 F.2d 106, 127 (2d Cir.), modified per curiam on other grounds, 439 F.2d

1198 (2d Cir.), cert. denied, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971) (Friendly, J.), *United States v. Sullivan,* 498 F.2d 146 (1st Cir.), cert. denied, 419 U.S. 993, 95 S.Ct. 303, 42 L.Ed.2d 265 (1974) and *Colella v. United States,* 360 F.2d 792 (1st Cir.), cert. denied 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966), relied upon by appellant, are also contrary to his position. In *Sullivan* the court commented:

> Though common law embezzlement "carries with it the concept of breach of fiduciary relationship," . . . neither "stealing," "abstraction," nor "conversion" do. We see no reason grounded in policy or logic to extend to these terms a requirement of breach of fiduciary responsibility.

498 F.2d at 149 n. 4. Neither do we.

The fact that Capanegro's bills had to be passed upon by the Union is not at all pertinent. As Judge Friendly observed in *Silverman,* "the 'union' presumably would have objected if it had been able to speak freely." 430 F.2d at 127. In *United States*

---

**6.** In his dissenting opinion Judge Friendly cites cases where the courts, when faced with congressional use of the term employee or its "equivalent," have construed that language in the common law sense excluding independent contractors. However, in all of these cases the distinction served the statutory purpose. If the issue is whether the employer is responsible for the tort of his employee, *Strangi v. United States,* 211 F.2d 305 (5th Cir. 1954) (Federal Tort Claims Act), or whether an employee is to be compensated when injured during the course of his employment, *Baker v. Texas & Pacific Ry. Co.,* 359 U.S. 227, 79 S.Ct. 664, 3 L.Ed.2d 756 (1950) (FELA); *Cimorelli v. New York Cent. R. Co.,* 148 F.2d 575 (6th Cir. 1945) (FELA); or whether the pay, working conditions or unemployment tax payments of the employee are safeguarded, *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) (FLSA); *United States v. New England Coal & Coke Co.,* 318 F.2d 138 (1st Cir. 1963) (Walsh-Healey Act); I.R.C. §§ 3121(d)(2), 3306(i), then the degree of control exercised by the employer over the work performed and the job environment sensibly determines the employer's responsibility. The distinction between independent contractor and employee in those contexts is meaningful. But these cases have no relevance when the purpose of the statute is not to enforce some obligation upon the employer but rather to protect the funds of the union treasury from raids

by those whose employment in a position of trust gives them access to those funds. In such cases it should make no difference whether the person employed is an employee or an independent contractor. The employer's degree of control over the thief is simply not relevant. As Mr. Justice Cardozo observed, "Our concern is to define the meaning [of the statutory term] for the purpose of a particular statute which must be read in light of the mischief to be corrected and the end to be attained." *Warner v. Goltra,* 293 U.S. 155, 158, 55 S.Ct. 46, 48, 79 L.Ed. 254 (1934).

The purpose of the statute here was to discourage corruption by those employed in a position of trust by the union. 29 U.S.C. § 401. Had Capanegro been "house counsel" then the dissent apparently would concede that he would be criminally liable under § 501(c). The fact that he had his own outside office and employed his own secretary provides no reason at all to exempt him from that liability. A distinction made on this basis frustrates the congressional purpose by permitting the prohibited mischief to be easily achieved. Capanegro enjoyed a position of trust in his employment as an attorney which he egregiously abused and he should not be permitted to escape by mechanical recourse to a hoary common law rubric which is totally inappropriate here.

*v. Dibrizzi,* 393 F.2d 642 (2d Cir. 1968) which also involved a § 501(c) violation, we held that even if payments were authorized by the union, it did not absolve a union official charged with conversion of union funds. "When one sends the union a voucher known to be an improper one, and then receives payment of the voucher, the crime is completed." Id. at 645.

Appellant reminds us that in construing a criminal statute we should not enlarge its reach beyond the language employed by the statute. *Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952). We agree. But the statute, in our view, clearly provides that a person employed by the Union under the circumstances we have set forth is unambiguously within its coverage. The Supreme Court has recently noted,

> It is true that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity . . . ." But here the Congress has conveyed its purpose clearly, and we decline to manufacture ambiguity where none exists.

*United States v. Culbert,* —— U.S. ——, ——, 98 S.Ct. 1112, 1116, 55 L.Ed.2d 349 (1978).

Judgment affirmed.

FRIENDLY, Circuit Judge, dissenting:

Judge Griesa was abundantly justified in concluding that Capanegro had been a party to a plan for embezzling, abstracting and converting the funds of Local 1101 of the Communication Workers of America. If the Government had procured an indictment charging that Carnivale had violated 29 U.S.C. § 501(c) and that Capanegro had aided and abetted him, I would have no hesitation in affirming a conviction. However, the Government chose instead to charge Capanegro as principal and thereby raise the question whether § 501(c) includes a person whose relationship to the union is solely that of an independent contractor. With respect I cannot agree with the majority's conclusion that it does if his relationship with the union is close enough.

Although the majority concedes that "Capanegro as retained counsel of the Union was not its 'employee' in the common law sense of a servant as distinguished from an independent contractor," it is worth emphasizing how well-advised the concession is. Neither the retainer agreement quoted *ante* at pages 976–977, nor Capanegro's references to himself as the Union's chief counsel, nor any other aspect of the relationship between Capanegro and the Union removes him from the common law description of an independent contractor as a person "who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right of control with respect to his physical conduct in the performance of the undertaking." Restatement Second of Agency § 2(2) (1958); see *Logue v. United States,* 412 U.S. 521, 527, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973); *Radio City Music Hall Corp. v. United States,* 135 F.2d 715 (2 Cir. 1943) (L. Hand, J.). In *Avis Rent a Car System, Inc. v. United States,* 503 F.2d 423, 429 (2 Cir. 1974), we laid out some of the other applicable criteria: whether the person rendering service has a substantial investment in his own tools or equipment; whether he undertakes a substantial cost, as by employing his own laborers; whether he has an opportunity to profit depending on his management skill; whether the relationship between the person rendering the service and the person receiving it is permanent; and whether the person rendering the service works in the ordinary course of the recipient's business rather than in an ancillary capacity. See also *NLRB v. United Insurance Co.,* 390 U.S. 254, 259, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968); Restatement Second of Agency § 220. The evidence here was that Capanegro maintained his own office and employed a secretary, and that he possessed a "special skill" upon which his opportunity to profit depended. It is of no moment that services like Capanegro's could equally well have been rendered by house counsel. That was not the relationship here.

As I understand it, the majority would agree that Capanegro would not fall within § 501(c) if that section had been worded

"Any officer or employee who embezzles, steals" etc. "assets of a labor organization of which he is an officer or employee. . . ." Its conclusion that "the statute we are construing does not limit its coverage to officers or employees of a labor organization," rests primarily on the basis that the draftsman applied the prohibition to "any person" who embezzles or steals from a labor organization "by which he is employed." This method of drafting, it is argued, evidences an intention of Congress to avoid use of the term "employee", with its attendant common law connotations, in favor of a broader usage of the term "employ" which would include all persons hired by a union as independent contractors—lawyers, accountants, physicians, architects, builders of union headquarters, etc.—provided their relationship with the union is sufficiently intimate.

In the absence of any legislative history to support such a conclusion,[1] this is attributing altogether too much significance to what on its face appears to be only a draftsman's choice. When Congress meant to go beyond officers and employees in imposing criminal liability for the misapplication of funds, it has not left the matter to ambiguous inference. See 18 U.S.C. §§ 656 and 657 ("Whoever, being an officer, director, agent or employee of, or connected in any capacity with" . . . . ).

The conclusion that Congress would have given a much clearer signal if it had intended § 501(c) to include independent contractors is fortified by history with respect to related statutes. When Congress has used the term "employee" or its equivalent, the courts have generally confined it to its common law meaning; in those instances where the courts have gone further, Congress has corrected them. Examples of the attitude first described are *Cimorelli v. New York Central R. R.,* 148 F.2d 575, 577–78 (6 Cir.

1945), (provision of the Federal Employers' Liability Act, 45 U.S.C. § 51, that "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier," described "the conventional relationship of employer and employee" and excluded independent contractors); see also *Baker v. Texas & Pacific Ry. Co.,* 359 U.S. 227, 79 S.Ct. 664, 3 L.Ed.2d 756 (1959) (Federal Employers' Liability Act); *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) (Fair Labor Standards Act); *United States v. New England Coal and Coke Co.,* 318 F.2d 138, 143–44 (1 Cir. 1963) (phrase "all persons employed by the contractor," in the Walsh-Healy Act, 41 U.S.C. § 35(b), was not intended to embrace persons who were independent contractors); *Strangi v. United States,* 211 F.2d 305 (5 Cir. 1954) (Federal Tort Claims Act). An example of the latter is the 1948 amendments to the Social Security Act and the relevant sections of the Internal Revenue Code which overruled the expansive construction given in *United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947) and *Bartels v. Birmingham,* 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947), and tied the definition of "employee" to common law standards, 62 Stat. 438, now codified at I.R.C. §§ 3121(d)(2), 3306(i); see 42 U.S.C. § 410(j), in what the Senate Report termed a "reassertion of Congressional intent regarding the application of the act." S.Rep.No.1255, 80th Cong., 2d Sess. 7 (1948). See *United States v. W. M. Webb, Inc.,* 397 U.S. 179, 182–90, 90 S.Ct. 850, 25 L.Ed.2d 207 (1970). An example still more pertinent to this case was the overruling of *NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 129, 64 S.Ct. 851, 859, 88 L.Ed. 1170 (1944). There the Court, pursuing a line of argument of which the majority's opinion is quite reminiscent, stated that the barebones definition

---

1. Such legislative history as exists is to the contrary. Congress did not enact proposed versions of the LMRDA that would have exposed to criminal liability anyone "engaged directly or indirectly in or connected in any capacity with (i) the administration, management, or control of money or other property of a labor organization . . .," S. 748, 86th Cong., 1st Sess. § 412(a) (1959); H.R. 4473, 86th Cong., 1st Sess. § 215 (1959), or, broader yet, "any person" whether or not employed by a labor organization, S. 1137, 86th Cong., 1st Sess. § 407 (1959); H.R. 7265, 86th Cong., 1st Sess. § 306 (1959).

of employee in § 2(3) of the NLRA left "no doubt that its applicability is to be determined broadly, in doubtful situations, by underlying economic facts rather than technically and exclusively by previously established legal classifications," and upheld the NLRB's determination that newsboys distributing papers on a commission basis and subject to various supervisory controls were the papers' employees—a view which surely made sense in the statutory context. Nonetheless, in the Taft-Hartley Act Congress amended § 2(3) expressly to exclude independent contractors. The House report which accompanied the statute used unusually strong terms with respect to the *Hearst* decision.

An "employee", according to all standard dictionaries, according to the law as the courts have stated it, and according to the understanding of almost everyone, with the exception of members of the National Labor Relations Board, means someone who works for another for hire. But in the case of *National Labor Relations Board v. Hearst Publications, Inc.* (322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944)), the Board expanded the definition of the term "employee" beyond anything that it ever had included before, and the Supreme Court, relying upon the theoretic "expertness" of the Board, upheld the Board. In this case the Board held independent merchants who bought newspapers from the publisher and hired people to sell them to be "employees". The people the merchants hired to sell the papers were "employees" of the merchants, but holding the merchants to be "employees" of the publisher of the papers was most far reaching. It must be presumed that when Congress passed the Labor Act, it intended words it used to have the meanings that they had when Congress passed the act, not new meanings that, 9 years later, the Labor Board might think up. In the law, there always

has been a difference, and a big difference, between "employees" and "independent contractors". "Employees" work for wages or salaries under direct supervision. "Independent contractors" undertake to do a job for a price, decide how the work will be done, usually hire others to do the work, and depend for their income not upon wages, but upon the difference between what they pay for goods, materials, and labor and what they receive for the end result, that is, upon profits. It is inconceivable that Congress, when it passed the act, authorized the Board to give to every word in the act whatever meaning it wished. On the contrary, Congress intended then, and it intends now, that the Board give to words not farfetched meanings but ordinary meanings. To correct what the Board has done, and what the Supreme Court, putting misplaced reliance upon the Board's expertness, has approved, the bill excludes "independent contractors" from the definition of "employee".

H.R.Rep.No.245, 80th Cong., 1st Sess. 18 (1947). While Congress did not repeat the express exclusion of independent contractors in the definition of "employee" in § 402(f) the LMRDA,[2] this was doubtless because it saw no need to reiterate what it had so plainly said. Indeed, the majority does not contend that Capanegro was an "employee" as defined in § 402(f).

What is ultimately dispositive is that § 501(c) is a criminal provision and thus implicates Justice Jackson's warning in *Morissette v. United States,* 342 U.S. 246, 263, 92 S.Ct. 240, 249, 96 L.Ed. 288 (1952) (footnote omitted):

The spirit of the doctrine which denies to the federal judiciary power to create crimes forthrightly admonishes that we should not enlarge the reach of enacted crimes by constituting them from anything less than the incriminating compo-

---

**2.** This reads:

(f) "Employee" means any individual employed by an employer, and includes any individual whose work has ceased as a consequence of, or in connection with, any current

labor dispute or because of any unfair labor practice or because of exclusion or expulsion from a labor organization in any manner or for any reason inconsistent with the requirements of this chapter.

nents contemplated by the words used in the statute. And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.

Cf. *United States v. Ferrara,* 451 F.2d 91, 95 (2 Cir. 1971), *cert. denied,* 405 U.S. 1032, 92 S.Ct. 1291, 31 L.Ed.2d 489 (1972); and *United States v. Ottley,* 509 F.2d 667, 672 & n. 7 (2 Cir. 1975) (applying *Morissette* in interpreting criminal provisions of LMRDA). The wisdom of this statement is illustrated by the consequences of ignoring it. Instead of being able to refer to a well-developed body of law which provides a basis on which criminal liability can be determined, trial judges and juries must now minutely scrutinize the relationships of independent contractors to unions to determine if they are close enough for the statute to apply. The majority supplies no real clue as to when "employee" in § 501(c) is to be taken in its common law context and when it is not. I am baffled how the majority can conclude that a criminal statute requiring such an inquiry to determine whether a person is subject to it could pass muster under such cases as *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939) and *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954). At the very least such an interpretation of § 501(c) raises constitutional doubts which a court should avoid. Furthermore, the majority seems to have involved itself in the anomaly of giving the criminal provision, § 501(c), a broader sweep than the civil ones, §§ 501(a) and (b), since Capanegro could be brought under these only by characterizing him as a "representative" of a labor organization—a tour de force in which the majority is as yet unwilling to engage. See footnote 5 to majority opinion. The understandable desire that Capanegro should not escape criminal punishment should not lead us to extend the statute beyond what Congress directed.

I would reverse the conviction with instructions to dismiss the indictment on the ground that Capanegro was not a person employed by a union as required by § 501(c).